PULS and another, Appellants, v. ST. VINCENT HOSPITAL, Respondent.

*October 30—November 28, 1967.*

680

682

For the appellants there were briefs by *Burns & Lubinski* of Seymour, and by *Kaftan, Kaftan & Kaftan* of Green Bay, and oral argument by *Michael Burns* and *J. Robert Kaftan*.

For the respondent there was a brief by *Davis, Soquet & Cherney* of Green Bay, and oral argument by *Donald E. Soquet*.

CURRIE, C. J.    While additional questions are raised by plaintiffs, we deem it only necessary to resolve these issues:

(1) Does the evidence establish that defendant hospital was causally negligent as a matter of law?

(2) Did the trial court commit prejudicial error in refusing to give the jury a requested *res ipsa loquitur* instruction?

(3) Did the trial court commit prejudicial error in not giving a requested instruction with respect to the duty of care which defendant owed to Mrs. Puls because of her physical and mental condition?

(4) Does the jury's verdict reflect passion and prejudice so as to be perverse?

(5) Should a new trial be ordered in the interest of justice?

## *Defendant's Negligence.*

Plaintiffs contend that the jury's finding that defendant was not negligent is not supported by the credible evidence, and that such evidence requires a holding that defendant was causally negligent as a matter of law. In support of this contention, plaintiffs urge particularly the failure to notify Dr. Wunsch of Mrs. Puls' drugged condition until 3 a. m. of the day of the fall, and the failure after 7:30 a. m. to take any precautions to prevent her moving about or falling.

With respect to the failure to call Dr. Wunsch until 3 a. m., it is pointed out that Mrs. Pugh of the hospital staff first became aware that something was wrong with Mrs. Puls at 1:30 a. m. when she helped her to the bathroom. Plaintiffs assert that Dr. Wunsch should have been notified then so that he would have ordered the pumping of the stomach. Dr. Wunsch testified that if he had been notified at 1:30, he might have ordered the stomach pumping. After so stating he added, "I can't say more than that because it would depend upon other factors." Upon the testimony of Mrs. Pugh, Sister Bertrandine, and Sister Rebecca, we deem an issue for the jury was presented as to whether the hospital was negligent in failing to notify Dr. Wunsch of Mrs. Puls'

drugged condition prior to 3 a. m. Furthermore, Dr. Wunsch was not positive that he would have ordered stomach pumping if he had been notified sooner.

This leaves for consideration the alleged failure of the hospital to take precautions for Mrs. Puls' safety between 7:30 a. m. and the time of the fall around 9 a. m. Plaintiffs contend that defendants failed to exercise due care during this period in these respects: (a) Not using bedrails on Mrs. Puls' bed; (b) not stationing someone in her room until she had completely emerged from her drugged condition; and (c) not checking her more often than was done.

Plaintiffs called as an expert witness a Miss Lepow, director of nursing service at Outagamie County Hospital. She testified that for the protection of a patient in Mrs. Puls' condition she would have used side rails on the bed. On the other hand Dr. Wunsch gave two reasons why he did not order side rails on the bed. One was that he thought Mrs. Puls would resent any physical restraint. The other was that he saw no necessity for it. Sister Rebecca testified that she hesitates to put up side rails, because psychiatric patients object strenuously and many times get very upset over it. She stated further that she never puts side rails up on a patient's bed unless ordered by the doctor. However, the evidence discloses that, after the accident, side rails were used on Mrs. Puls' bed although not ordered by a doctor.

After 7 a. m. on the morning of January 19, 1961, there were six or seven nurses and some assistants on duty in the psychiatric ward with 17 patients to attend. The evidence does not disclose whether the duties of these hospital personnel would have permitted the full-time stationing of one of them in Mrs. Puls' room. In the absence of evidence to the contrary, it is a permissible inference that one of them could have been so stationed for a period until Mrs. Puls was able to be up and about. However, Dr. Wunsch after viewing Mrs.

Puls at 7:30 did not order that this be done but merely directed, "Keep checking her." The evidence does not disclose how often she was checked thereafter up until the time of her fall. However, even if she had been checked every fifteen minutes, the fall could very well have occurred in between such checkings.

With respect to the issue of the degree of care the hospital owed Mrs. Puls from 7:30 a. m. until the time of fall, the opinions which Dr. Wunsch and Sister Rebecca formed from their contact with her at 7:30 are also material. Dr. Wunsch's opinion was that Mrs. Puls was no longer in danger and could look after herself in bed. Sister Rebecca thought Mrs. Puls was quite alert, although a little bit sleepy, and that her condition did not present any special problem. Opposed to these sanguine opinions of her condition was the hospital chart notation that at 7:30 a. m. Mrs. Puls could not be aroused for breakfast and a further one to the effect that at 10 a. m., which was after the fall, that her "speech remains very slurred."

We deem that the record clearly demonstrates that whether defendant exercised due care in caring for Mrs. Puls from 7:30 a. m. until her fall presented an issue of fact for the jury.

We conclude that there is no merit to plaintiffs' contention that the jury's finding of no negligence on the part of defendant should be set aside and defendant found to have been causally negligent as a matter of law.

### Res Ipsa Loquitur.

Apart from any other reason which may have existed for the trial court refusing to give to the jury a *res ipsa loquitur* instruction, this refusal was proper because substantial proof of negligence had been adduced which would have rendered the giving of the *res ipsa* instruction superfluous. This proof consisted of the expert testimony of Miss Lepow previously recounted herein, together with

the failure of defendant to have done some of the things plaintiffs urged were required of it in exercising due care. This is not the case of an unexplained injury.

We consider the instant issue is governed by *Fehrman v. Smirl* [1] wherein it was stated:

"When proof of negligence is offered, the trial judge, in contemplating the instructions which he will give to the jury, must evaluate the testimony to determine if there has been such substantial proof of negligence as to render superfluous the giving of an instruction on *res ipsa loquitur*. Sometimes the question as to the adequacy of the proof of negligence will be a close one; it will be within the sound discretion of the trial judge to determine whether the giving of the instruction will be redundant." [2]

The instant case is not one which we would classify as presenting a close question as to the adequacy of the proof of negligence.

### Instruction With Respect to Degree of Care Owed by Defendant.

The trial court with respect to the duty owed by defendant to Mrs. Puls instructed the jury as follows:

"You are instructed that it was the duty of the defendant, St. Vincent Hospital, and its employees to exercise such reasonable care and attention for the safety of the plaintiff *as her* [Mrs. Puls] *condition, both physical and mental,* may have required. A hospital such as the defendant, St. Vincent Hospital, which undertakes to care for a patient is under a duty to exercise such reasonable care in looking after and protecting the patient *as the patient's condition, both physical and mental,* may require." (Emphasis suplied.)

Plaintiffs allege as prejudicial error the refusal of the trial court to give a requested instruction on the duty

[1] (1964), 25 Wis. 2d 645, 131 N. W. 2d 314.

[2] *Id.* at page 653.

owed by defendant to Mrs. Puls that required a page and a half to print in the appendix to the plaintiffs' appellate brief. We quote three excerpts therefrom as follows:

"It is undisputed the defendant, St. Vincent Hospital, accepted the plaintiff, Mary Puls, as a patient in the psychiatric division of the hospital on November 18, 1960 and that the defendant undertook to give the plaintiff, Mary Puls, such care, attention and nursing as was required in view of her mentally and emotionally disturbed condition. . . .

"You are instructed that when Mrs. Puls was admitted to the psychiatric division of the hospital of the defendant, the defendant hospital was under the obligation to exercise such care and attention for her safety as her known physical and mental condition required, and this obligation continued throughout the period of hospitalization of Mrs. Puls. . . .

"You are further instructed the defendant hospital and its employees were at all times, during the care and treatment of nervous or mentally and emotionally disturbed patients, required to use such means to restrain and guard them from injury to themselves as would seem reasonably sufficient to an ordinarily prudent person under like circumstances and this requirement to use such care was owed the plaintiff, Mary Puls, as a patient in the psychiatric division of St. Vincent Hospital."

These quoted excerpts emphasize Mrs. Puls' "mentally and emotionally disturbed" condition, not as a result of the self-administered sleeping pills, but with respect to her condition generally throughout her stay as a patient in the hospital. It further suggests that, because she was being treated in the psychiatric division, there existed a special duty on the part of defendant to restrain and guard her. The undisputed evidence discloses that she was not psychotic and had no delusions. There is no evidence that her condition was such as to require any special watching or guarding. The fact that she was allowed privileges which permitted her to be away from the hospital unattended during the daytime would negate any such inference. There was no testimony, expert or

otherwise, that the hospital practice of dispensing her nightly medication so that she could take it in her room was improper hospital practice with respect to a patient in her condition.

If there was any negligence on the part of defendant, it was not in how they treated and cared for Mrs. Puls as a psychiatric patient but consisted in what the hospital personnel did or failed to do after becoming aware of her drugged condition about 1:30 a. m. on the morning she fell. Therefore, the trial court properly refused to give the requested instruction.

## *Alleged Perversity of Verdict.*

Plaintiffs point to the jury's awards of damages as proof of passion and prejudice amounting to perversity.

The jury awarded Mrs. Puls $2,500 for her personal injuries. Mr. Puls was awarded $1,000 for loss of his wife's services and society; $1,980.30 for medical, hospital, and drug expenses; and $700 for household help.

Testimony adduced by plaintiffs shows the following: during the five years from accident to trial, Mrs. Puls suffered pain and discomfort and was required to wear an uncomfortable orthopedic garment; she can no longer do heavy housework or participate in recreational activities with her husband; Mr. Puls had expended $2,461.30 for medical, hospital, and drug expenses related to his wife's back problems; Mr. Puls expended $2,592.49 for household expenses.

The medical testimony indicates that the minimal compression fracture of the 11th vertebra is of very little significance and that pain and discomfort caused by the fall of January 19, 1961, which Mrs. Puls sustained subsequent to her discharge from the hospital, was due to the soft tissue injury. Dr. Kuhs testified in behalf of plaintiff that in his opinion there was a chronic injury to the tissue. He further stated that there was a weakness

in her back and some distortion of posture and a probability that this would be permanent. Dr. Freidman, an orthopedic specialist called by defendant, had examined Mrs. Puls on March 16, 1965. He testified that physical findings were "essentially nil" but that there were considerable subjective complaints.

Mrs. Puls, however, has sustained five additional accidents subsequent to January 19, 1961. In May, 1961, she drove an automobile through a stop sign and collided with another car. She bumped her head and felt the shock. In August, 1961, she slipped on some soap in a washroom of a train, fell, and strained her lower back. In December, 1962, she slipped and fell in the kitchen of her home. In September, 1963, she slipped in the bathroom of her home and fell straining the upper part of her back. In December, 1963, the auto she was driving was rear ended by another car, and she sustained a whiplash injury.

Dr. Kuhs testified that these subsequent injuries compounded the original injury and "The total of her back is the product of the initiating incident, plus some or all of the subsequent injuries."

Undoubtedly, the jury concluded that some of the pain and disability was attributable to the accidental injuries sustained subsequent to the fall in the hospital. This is apparent from the failure to award the full amount claimed for medical expenses and hiring household help. The testimony of Dr. Kuhs would support such a conclusion.

The trial judge in his memorandum decision on motions after verdict stated:

"I do not believe it necessary to discuss the damages awarded by the jury other than to say that there was a considerable difference of opinion among the physicians regarding the extent and duration of the plaintiff's injuries. In view of these differences, the damages awarded do not appear to be unfair."

If there is any credible evidence which under any reasonable view supports the jury finding as to damages, especially when the verdict has the approval of the trial court, this court will not disturb the finding.[3] Even when it still appears that the award is low, this court will not interfere with the jury's finding, unless the award is so unreasonably low as to shock the judicial conscience.[4] We do not consider the damages awarded here fall in such category, and, therefore, hold there was no perversity.

### New Trial in the Interest of Justice.

This court will not order a new trial in the interest of justice under sec. 251.09, Stats., unless the court, viewing the case as a whole, is convinced that there has been a probable miscarriage of justice.[5]

Mrs. Puls' fall around nine o'clock in the morning following the taking of an overdosage of doriden and sodium amytal before midnight of the preceding day was a highly unusual result. Dr. Wunsch testified he was unable to understand it from a medical standpoint, because the effect of doriden lasts three to six hours, and the effect of sodium amytal lasts four to eight hours at "the outside." The jury may very well have considered this testimony in deciding whether the hospital attendants were negligent in not watching Mrs. Puls more closely than they did after 7:30 a. m. It also is one of the factors which we have considered in passing on the issue of

[3] *Seitz v. Seitz* (1967), 35 Wis. 2d 282, 301, 151 N. W. 2d 86; *Springen v. Ager Plumbing & Heating, Inc.* (1963), 19 Wis. 2d 487, 489, 120 N. W. 2d 692.

[4] *Seitz v. Seitz, supra,* footnote 3, at page 302; *Bethke v. Duwe* (1950), 256 Wis. 378, 385, 41 N. W. 2d 277.

[5] *Estate of Scheibe* (1967), 35 Wis. 2d 89, 94, 150 N. W. 2d 427; *Chapnitsky v. McClone* (1963), 20 Wis. 2d 453, 467, 122 N. W. 2d 400.

whether the jury's verdict constituted a miscarriage of justice.

We do not have a feeling that under all the circumstances justice probably miscarried, and, therefore, decline to exercise our discretion to order a new trial in the interest of justice.

*By the Court.*—Judgment affirmed.