CROTTY, Individually and as Administrator of the Estate of Avis Mary Crotty, Respondent, v. BRIGHT and another, Appellants.

*No. 94. Argued March 31, 1969.—Decided May 6, 1969.*
(Also reported in 167 N. W. 2d 201.)

442

For the appellants there was a brief by *deVries, Vlasak & Schallert,* and oral argument by *Arthur J. Vlasak* and *Michael B. Rick,* all of Milwaukee.

For the respondent there was a brief by *Martin J. Torphy* and *Kersten & McKinnon,* attorneys, and *George P. Kersten* of counsel, all of Milwaukee, and oral argument by *George P. Kersten.*

CONNOR T. HANSEN, J. The defendants raise five issues on appeal:

1. Whether the trial court erred in instructing the jury that special circumstances require the exercise of greater care with respect to the defendant only?

2. Whether evidence of the defendant's conduct after he left the scene where the accident later occurred was improperly received?

3. Whether the jury's comparison of negligence was against the great weight and clear preponderance of the evidence?

4. Whether the award of $25,000 for pecuniary loss is contrary to the evidence?

5. Whether a new trial should be granted in the interest of justice?

The evening before the accident, defendant bought an eleven-year-old car for $90 from Bluemound Motors. He had much difficulty getting the car started and was aware that the battery was low. The morning after he purchased the car he returned to Bluemound Motors and requested that they charge the battery and replace the

corroded battery cables and make other repairs. Blue-mound Motors made certain repairs, but it did not charge the battery or replace the battery cables. The defendant realized this, but nevertheless took his car home.

When he returned home from Bluemound Motors, he picked up his wife and baby and went to his father's house, where he spent the evening. When he left his father's house between 11:30 and 11:45 p. m., he found he could not start his car and the battery ground down to the point where it was dead. He finally got his car started by obtaining a push from his father's car, and after allowing his own car to warm up, left his father's house shortly after midnight. It was about one and one-half miles from there to the scene of the accident.

Defendant drove home south on Sunny Slope Road. Sunny Slope Road is a two-lane road, 22 feet 4 inches wide, and unlighted. He came to an arterial stop at an intersection with Cleveland avenue. The lights of his car dimmed down and his car started idling roughly. He continued across Cleveland and started down a hillcrest south of Cleveland and his lights dimmed down and it began idling roughly again. He made it to a second rise in the road and the lights, motor and everything went out. He coasted down the hill in a futile attempt to get the car started. There is a driveway near the top of the hill and he made no attempt to pull onto it.

The car came to a stop at the bottom of the hill. Plaintiff claims defendant left the car entirely on the south-bound lane of the road. Defendant claims that as his car came to a stop at the bottom of the hill, he pulled it onto the right-hand shoulder and off of the road as far as possible. The record does not contain any testimony as to the width of the shoulder. However, the photographs admitted into evidence indicate it is quite narrow, and that a snow-filled ditch or depression extends beyond it. The plaintiff testified that the ditch is less than two feet from the edge of the pavement.

Defendant then walked to a nearby house and obtained permission from a baby-sitter there to use the phone. He made a call to the baby-sitter at his father's neighbor's house, whom he asked to go rouse his father (who did not have a phone) and have his father come give him a push.

He then returned to his car and waited there about forty or forty-five minutes. Approximately 11 cars, some going north and some going south, passed him without incident. Finally, defendant claims that at about 1 a. m. he and his wife (with the baby) flagged down the next car that came by and obtained a ride back to his father's house. He left the disabled car on the highway without any lights on.

At his father's house he got his father up and attempted to get his father's car started, but without success. He then went to bed without any further attempt to get his car off the highway.

Defendant admitted that he made no calls to any police department, towing service or other facility that might have brought him help.

Shortly after 1 a. m. plaintiff was heading south on Sunny Slope Road in his car, with his wife as a front seat passenger. Plaintiff was driving 30 to 35 miles per hour in a 35 mile per hour zone. As plaintiff started down the long grade that ends at the scene of the accident, he was confronted by a northbound car coming up the grade. Plaintiff testified that because of the headlights of the northbound car (which had already passed defendant's disabled car) glaring into plaintiff's windshield, his vision was interfered with for 100 to 150 feet and he was unable to see the defendant's car. He finally saw defendant's car a car length away and swerved to the left. The right front of his car collided with the left rear of the defendant's car.

Plaintiff's wife was killed and plaintiff sustained injuries.

## I.

### *Instructions.*

After instructing the jury on duty to keep a motor vehicle in reasonably safe condition, and duty surrounding leaving a disabled car on a roadway, over defendant's objection, the following instruction was given:

"I would further instruct you with regard to Question One [negligence of the defendant] of the special verdict that while the rule never changes that a person or motor vehicle driver must exercise ordinary care, the degree of care or diligence which a person must exercise to come up to the standard of ordinary care varies with the circumstances naturally calculated to affect or increase the hazard of collision or injury. The greater the danger which is or may be apparent to an ordinarily prudent person under the circumstances existing, the greater must be the degree of care which must be used to guard against such danger."

Defendants do not dispute that this instruction correctly states the law, but contend that giving the instruction was error because it in effect told the jury that the defendant was required to exercise a higher degree of care than the plaintiff, in order to meet the standard of ordinary care.

Defendants argue that because several cars had passed the disabled car without incident, he "had a right to assume that oncoming drivers would be able to see at least within the range of their headlights" and, therefore, no "higher" degree of care was required.

We conclude that the instruction did not inform the jury that the defendant should have used a greater degree of care than the plaintiff, but instead instructed the jury to determine whether there was an apparent danger which required a greater degree of care. In making such a determination, the jury could consider the fact that the

area was completely dark, the roadway was hilly, the area involved was in the heavily populated metropolitan centers of Milwaukee and Waukesha, and the time involved was shortly after midnight of New Year's Eve night.

Defendants also contend that if the instruction was to be given at all it should have been given with respect to both plaintiff and defendant, because plaintiff should have exercised a greater degree of care in slowing down when the headlights of the northbound vehicle interfered with his vision. We do not concur with this contention particularly because an instruction was given as to plaintiff's duty to reduce his speed if his vision is obstructed by dazzling lights:

"With regard to Question Three [negligence of the plaintiff] of the special verdict, I would instruct you that it is a rule of law that when one drives a motor vehicle on a highway in the nighttime, it is his duty, independent of any statute, to drive at such a rate of speed as will permit him to stop within the distance he can see ahead. This means that if by reason of dazzling lights of an oncoming car, the distance ahead that he can plainly see objects or other obstructions ahead of him is reduced, he must drive at such a rate of speed as will enable him to bring his car to a standstill within such reduced distance."

We find no prejudicial error in the instructions given by the trial court.

## II.

### *Conduct of defendant after leaving scene.*

The defendant asserts that the accident occurred sometime after he arrived at his father's home, and any evidence of his failure, after that time, to make efforts to remove his disabled vehicle from the highway was immaterial because it was not causal. Anticipating such evi-

dence might be offered, prior to trial the defendant moved to limit inquiry into the defendant's conduct to the time previous to the accident, *i.e.,* 1:05 a. m. The trial court determined that counsel for the defendant could make objections during the trial and the court would then rule on them.

The court overruled the objections during trial and in so doing made the following statement:

"He said these were approximations [referring to the defendant's statements of the time sequences involved]. I think it goes to establish intent as far as it would apply to an act of omission or commission in taking steps to either get the car off the highway or take reasonable steps to protect the traveling public from injury or damage."

The defendants answer that intent before or after the accident has no bearing on the question of negligence, and cite 1 Conrad, *Modern Trial Evidence,* p. 120, sec. 121 (1956) for the following proposition:

"In civil cases one's liability must rest upon his acts and the intent of a party is usually irrelevant, subject to certain exceptions."

Regardless of any question of intent, in this case we are of the opinion that testimony concerning defendant's actions after he left his abandoned vehicle was properly admitted.

A significant question as to defendant's negligence was whether he took "reasonable steps to remove the vehicle." As such, it is relevant to determine what steps he did take. Therefore, under the facts of this case the defendant's leaving the scene of the accident before its occurrence does not make evidence relating to his attempts to remove the vehicle after he left the scene immaterial. If the defendant had called a service vehicle or had notified law enforcement officials after abandoning the car, undoubtedly, he would desire such evidence to be admitted to demonstrate the steps he took to remove the vehicle.

Also evidence of defendant's actions after he left the scene was probative as to the credibility of the defendant. A part of the defense was that the defendant did everything he reasonably could to minimize the danger to traffic from his disabled vehicle. He testified, among other things, that he brought his car over onto the shoulder of the road when it stopped; that he made a telephone call for assistance (to the baby-sitter at his father's neighbor's house to get his father to come for help) ; and that after he had flagged a ride to his father's house he attempted to get his father's car started before retiring, a car which had started an hour before when it was used to push the defendant's car.

Also, the jury was not bound to accept the defendant's approximations of the timing of the sequence of events. The approximations were estimated by the defendant and he had no watch.

The defendant testified he left his father's house at 12:15 a. m.; that it took five minutes to drive from his father's house to where his car stalled. The defendant's wife testified that the defendant was gone about fifteen minutes when attempting to telephone his father's neighbor. The defendant testified they then waited in the car for forty or forty-five minutes for his father to arrive. That would make it 1:15 a. m. when they left the scene, and the accident occurred at 1:05 a. m. The defendant also testified that a woman in the car that drove them back to his father's house stated that it was 1 a. m. The defendant's estimates, while no doubt his best recollections, are not completely accurate and all of the testimony related to a relatively short period of time, both before and after the accident.

### III.

*Comparison of negligence.*

Defendants claim that because plaintiff failed to reduce his speed while his vision was obstructed by the lights of

the car approaching him, his negligence contributed substantially more than 10 percent to the cause of the accident.

This is a jury question and as stated in *Cornwell v. Rohrer* (1968), 38 Wis. 2d 252, 257, 156 N. W. 2d 373:

" '. . . we must judge the jury verdict in the light of the familiar rules that (1) a jury verdict will not be upset if there is any credible evidence which under any reasonable view fairly admits of an inference supporting the findings, (2) this is particularly true when the verdict has the blessing of the trial court, and (3) the evidence is to be viewed in the light most favorable to the verdict.' "

From our examination of the record, we conclude that the findings of the jury as to comparison of negligence are supported by the evidence.

## IV.

### Pecuniary loss.

The jury awarded the plaintiff $25,000 for his pecuniary loss as a result of the death of his wife, $5,000 for the loss of society and companionship of his wife, and $5,000 for the plaintiff's past pain and suffering.

On motions after verdict the trial court reduced the damage award for the plaintiff's pain and suffering to $2,000, and the loss of society and companionship to the statutory maximum of $3,000.

Also, the trial court ordered an option under the *Powers* [1] rule to the award for pecuniary loss and reduced the award to $20,000.

The defendants take the position that a new trial is required because the award of $25,000 is the result of

[1] *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 102 N. W. 2d 393.

passion and prejudice and that the reduction by the trial court to $20,000 did not cure the error.

In applying the *Powers* rule, the trial court must set the amount of damages at a figure which it considers to be the most reasonable in view of the evidence, and since reasonable men may differ, the trial court's determination will be upheld if it falls within the range of reasonableness. *Lewandowski v. Preferred Risk Mut. Ins. Co.* (1966), 33 Wis. 2d 69, 78, 146 N. W. 2d 505.

When the trial court has thus reviewed the evidence, and ordered an option under the *Powers* rule, the rule for review in this court is as follows:

" 'Where a trial judge has reviewed all the evidence and has found a jury verdict awarding damages to be excessive and has fixed a reduced amount therefor, and has determined that there should be a new trial on damages unless the plaintiff takes his option for a judgment on the reduced amount, this court will reverse his directions "only if we find an abuse of discretion on the part of the trial court." ' " *Neider v. Spoehr* (1968), 39 Wis. 2d 552, 563, 159 N. W. 2d 587.

The life expectancy of the plaintiff at the date of the accident was 18.09 years and of the deceased 21.63 years. Prior to her death, Mrs. Crotty had performed all of the usual duties of a housewife: cooking, cleaning, shopping, laundry and general household management. She had also prepared a special diet for her husband because of a heart attack he suffered in 1963. She was a registered nurse; however, the only testimony concerning her nursing the plaintiff was the plaintiff's statement that ". . . she kept good check on me, and special foods, whatever I needed she took care of for me."

Evidence offered on the question of the amount of pecuniary damage demonstrated a great divergence of values. A supervisor of the Department of Industry, Labor & Human Relations testified as to the minimum

wage rate for domestic services if room and board were furnished. The manager of a company which provides temporary help in the domestic field also testified. He stated that his company matches the employee with the employer. He described their services as "Esoteric . . . limited to a chosen field, some people can afford our services, some can't." This witness described the going rate for such domestic services in the plaintiff's residential area.

We do not consider it necessary to review in detail the cost figures of the various types of domestic service set forth in the record. Had the jury based its award for pecuniary damages on the testimony of any particular witness, its determination could have been either smaller or larger than its ultimate determination of $25,000 which was later reduced to $20,000 by the trial judge.

In considering an award of damages for pecuniary loss in a wrongful death action, in *Vogt v. Chicago, M., St. P. & P. R.R.* (1967), 35 Wis. 2d 716, 721, 151 N. W. 2d 713, it was stated:

"This court has consistently held the rule to be that the evidence of pecuniary loss in a wrongful-death case need not be exacting or very strong to sustain a jury award, and that a jury award will not be overturned unless it is so large as to indicate bias, passion or perversion of judgment on the part of the jury." (Authorities cited.)

The fact that a trial judge has ordered a reduction of a jury award for being excessive does not mean a jury award has been overturned. From a review of the record, we cannot say the trial court was wrong in not finding passion and prejudice nor do we find any abuse of discretion on the part of the trial court in not reducing further the award for pecuniary damages.

"Where this court finds no abuse of discretion in a trial court's determining that the damages awarded by a jury are excessive, it is only in an unusual case that we will

disturb the amount which the trial court has fixed as reasonable for the purpose of granting the plaintiff an option to accept judgment in that amount in lieu of a new trial on damages. It cannot be held that a certain amount alone represents reasonable damages for a particular injury, or injuries, and that anything below or above that is unreasonable. In other words, reasonable damages fall anywhere between an unreasonable low and an unreasonable high." *Boodry v. Byrne* (1964), 22 Wis. 2d 585, 595, 596, 126 N. W. 2d 503.

## V.

### *Interest of justice.*

"This court will not order a new trial in the interest of justice under sec. 251.09, Stats., unless the court, viewing the case as a whole, is convinced that there has been a probable miscarriage of justice." *Puls v. St. Vincent Hospital* (1967), 36 Wis. 2d 679, 693, 154 N. W. 2d 308.

While testifying, one of the police officers referred to the point of impact; another witness volunteered testimony that the plaintiff was upset and cried out, "I lost my wife, I lost my wife." In each instance the court promptly and properly advised the jury to disregard the testimony.

The trial court instructed the jury on the life expectancy of the deceased instead of the plaintiff [a variance of approximately three years] in determining the pecuniary loss of the plaintiff. However, no objection to the instruction was raised at the trial or in motions after verdict. It follows that if any prejudicial error is attributable to this instruction it cannot now be raised for the first time on appeal. *Wells v. Dairyland Mut. Ins. Co.* (1957), 274 Wis. 505, 518, 80 N. W. 2d 380.

Although the deceased was a registered nurse, she had not performed any such services for sometime and there

is no testimony that private-duty services of a registered nurse were required by the plaintiff. Therefore, the testimony of a registered nurse as to the wage scale for private-duty services was of little probative value. As the trial court pointed out, the weight of such testimony was for the jury. In view of the complete lack of testimony that the plaintiff required such services or that the deceased performed any such private-duty services, it is unlikely the jury gave the testimony consideration.

The testimony of the domestic services company manager was properly admitted as he testified that the rates his company-paid employees received for such services were based in part on what other people pay for similar services.

An examination of the record does not convince us that there has been a probable miscarriage of justice.

*By the Court.*—Judgment affirmed.