ROACH, Respondent, v. KEANE, Appellant.

*No. 530 (1974). Submitted on briefs May 5, 1976.—*
*Decided June 30, 1976.*
(Also reported in 243 N. W. 2d 508.)

For the appellant the cause was submitted on the brief of *Lloyd A. Barbee* of Milwaukee.

For the respondent the cause was submitted on the brief of *Georgia A. Felger, Warren J. Klaus, John Sundquist* and *Walther & Halling,* all of Milwaukee.

DAY, J.   The judgment appealed from confirms a jury verdict finding that the defendant, Dr. Sean P. Keane, alienated the affections of Irene Roach, wife of plaintiff Raymond Roach, and engaged in criminal conversation with Irene Roach.[1]   For alienation of affection, compensatory damages of $7,500 and punitive damages of $2,500 were awarded; for criminal conversation, compensatory damages of $10,000 and punitive damages of $10,000 were awarded. The   principal issues on appeal are whether there was sufficient evidence to sustain the jury's finding that criminal conversation actually occurred, and whether the damages awarded are excessive.

Over 40 years ago Professor Nathan P. Feinsinger in an article in 10 Wisconsin Law Review 417 (1935) pointed out the problems involved in the so-called "heart balm" suits:

---

[1] Actions for alienation of affection and criminal conversation are now barred by statute, sec. 248.01.

"For generations the public has objected to the injustices alleged to result from actions for breach of promise to marry, seduction, alienation of affections and criminal conversation. . . .

"The principal evils aimed at are coercive extrajudicial settlements, unfounded actions and excessive verdicts. The law of blackmail or extortion is ineffectual to remedy the first mentioned evil, since the dread of publicity which controls in the first instance prevents the issue from being raised later in any form. While the rules of pleading and proof are theoretically a sufficient safeguard against the evil of legally unfounded actions, public opinion, stressing the disproportionately few cases dismissed on the merits, holds otherwise.

"Excessive verdicts are a possible danger in any action in which the jury is permitted to compensate for wounded feelings or to award exemplary damages. But the actions in question are unique in their connotation of sexual misconduct, interference with familial relations, and disregard for accepted canons of social propriety. This factor aggravates the usual tendency of juries to overcompensate for injured feelings and leads them to express their emotional sympathy and moral indignation in the guise of exemplary damages. In this expression juries are encouraged rather than checked by trial and appellate courts. The opinions of the latter characterize these actions as involving typically a virtuous and outraged plaintiff and a malicious and dishonorable defendant, a picture which is often wholly discordant with the life pattern. . . ."

The facts in this case show neither a "virtuous and outraged plaintiff" nor a "malicious and dishonorable defendant."

The trial testimony is in conflict over the two major factual questions: (1) the prior condition of the Roaches' marriage (which is relevant to the damage questions) and (2) the relationship between Mrs. Roach and Dr. Keane.

Raymond and Irene Roach were married on June 23, 1956, and divorced on January 25, 1971, and, according

to defense witnesses, lived the intervening years in a state of chronic emotional turmoil and frequent separation. Irene testified that marital difficulties began during her first pregnancy, while they were living in Toledo, Ohio, when Raymond bought a part interest in an airplane while forcing her to continue her job in order to pay the bills. Raymond consorted with known gamblers, allegedly losing money, and entertained other women in the plane on many late evenings. When Irene complained, Raymond exhibited his "violent temper" and struck her "many times," throwing her into a closet once when she was pregnant, and giving her two black eyes.

While Irene was pregnant with their second child, the most significant of their "many arguments about other women" occurred, concerning a Ms. W. According to Irene, Raymond admitted his involvement with this woman (a university undergraduate) and moved out for three or four weeks. Irene discovered a cache of letters and photographs, one letter of which is part of the record. In the summer of 1964, Raymond told Irene he wanted to marry Ms. W., and took Irene to see a Catholic priest (to whom he and Ms. W. had been going for religious instruction), who told them that their marriage was religiously valid and that Raymond could not marry Ms. W. in a Catholic church. Raymond moved out again, for four or five months.

After this, there was a reconciliation and a move to Minneapolis in the fall of 1964, where Raymond took a new job, promising to mend his ways. His nighttime philandering and physical abuse of Irene continued, according to her testimony. There were phone calls from unidentified women, and foreign lipstick stains on his clothing. In the fall of 1965, Irene began divorce proceedings and returned to her parents' home in Providence, Rhode Island, with the children until the following June.

Raymond provided no financial support, but did visit once —only to begin flirting with a girl he met there, Irene testified.

There was another reconciliation followed by brief stays in Fond du Lac, Green Bay, South Dakota, and Madison, as required by Raymond's job. There were frequent arguments concerning Raymond's relationships with other women. From mid-1967 until their divorce in 1971, the Roaches lived in the Milwaukee townhouse complex, scene of the events directly underlying this suit. According to Irene, Raymond swore at her in private and in public, and slapped her on at least one occasion in 1969.

Irene worked at various jobs throughout the marriage, for the purpose of accumulating money to buy a house; due to Raymond's profligacy, she testified, her wages always went to pay current expenses. At the time of their divorce, less than $1,000 had been saved.

The Roaches' 16-year-old daughter testified at length concerning her parents' stormy marriage, describing the arguments, her father's undesirable associates—particularly a violent alcoholic friend who had stayed with them in Madison—and the physical abuse of Irene by Raymond. The daughter corroborated Irene's testimony that they received many calls from unidentified women, and that her mother's earnings went to pay the bills.

Irene's sister, Joan Al'din, had been acquainted with Raymond since 1956, and had lived with the Roaches for a couple of months in 1958; she testified she left when Raymond made improper overtures toward her. Raymond denied this; Irene testified that he had laughed "sadistically" when she confronted him with her sister's report. Ms. Al'din also testified to having seen Raymond holding hands with an unknown woman in a restaurant. Ms. Al'din went to Minneapolis in 1965 to help her sister during the divorce proceedings, and was visiting in Madi-

son when some of the female telephone calls arrived. She saw Raymond strike Irene in Toledo, and again in Madison. She testified she was aware of Raymond's gambling habits from his conversation and the fact that money shortages were traceable to his losses.

Ernest Schluter was a business and social associate of Raymond while he was in Madison and Milwaukee, and testified to having overheard arguments between the Roaches, and Raymond's curses at Irene. On one occasion in 1967, he and Raymond had spent an evening with two Madison girls at a local bar; Raymond had later gone with one of them to an unknown destination. Schluter had heard Raymond use the alias "Ray Holland," and was told by Raymond not to mention it in front of Irene.

To rebut the defense testimony, Raymond relied entirely on his own testimony to establish his devotion as a husband and father prior to the move to Milwaukee in 1967. He did not recall ever having struck or physically abused Irene. He denied ever having loved another woman, having had a sexual relationship with another woman, or "propositioning" other women during the marriage. He admitted "courting" Ms. W., and receiving numerous letters from her during several months in 1964. He admitted having gone to Catholic instruction classes with Ms. W., but denied that these were marriage orientation sessions. He claimed to have spent less than $500 on the airplane in Toledo, and explained the 1965 separation as the result of financial difficulties. Telephone calls from women in Minneapolis were "totally" related to his employment, he testified. Raymond testified that the years between 1965 and mid-1970 were the happiest of his life. He specifically recalled that there were no significant arguments during the first half of 1970; he stated that he and his family "were always going someplace together," and that he consistently spent his evenings at home. He was finished with the period of assignments as "area sales manager" for his company

(which produced telephone directories), which had taken the family to North and South Dakota and to various cities in Wisconsin. They had "gone through an awful lot together" and now he "was to the point where I was making good money."

Following his wife's alleged affair with Dr. Keane and the divorce, Raymond testified, he suffered a "tremendous ache," "was constantly on tranquilizers," and moved to Colorado "to retain my sanity," although it is notable that his income went up 20 percent after the move, and he alleged no specific monetary damage.

Raymond's supporting witnesses included the manager of the Milwaukee townhouse complex in which he and his wife had lived, Vernon Lenhart, and Lenhart's wife Genevieve. Their home was two doors away from the Roaches'; they testified that they had heard no arguments between Mr. and Mrs. Roach, and that they had seen Mr. Roach playing with his children. The Roaches' immediate neighbor, Frances Brown, testified that she had never heard any arguments emanating from the Roach home. Their neighbor on the other side, Harley Kohl, also testified that no domestic discord in the Roach household had ever been evident to him.

Dr. Keane and his wife moved into the Roaches' townhouse complex during the summer of 1969, and left at the end of 1970. The Keanes and Roaches became acquainted, and in September, 1970, Irene Roach went to work as an office assistant for Dr. Keane, contingent, Raymond testified, on her being home when the children returned from school. After a few weeks, however, she began returning home at 6:00 to 7:00 p.m. Raymond testified that the Roaches ceased sexual relations by November, 1970, but according to him the first inkling of trouble came only on Saturday, January 2, 1971, when Irene told him she was suing for divorce. She had left that morning to run an errand at Dr. Keane's office, but did not return until nearly 6:00 p.m., when she told

him of her decision. He moved out of the townhouse a few days later, and the divorce decree issued on January 25. On January 27, 1971, Raymond said, he had seen Irene and Dr. Keane in a bar; Dr. Keane had his arm around her. Somewhat inconsistently, Raymond also testified that as early as October, 1970, he began receiving phone calls from Edith Keane, the doctor's wife, inquiring where her husband was. On one evening, Dr. Keane and Irene Roach did not return home until 11:00 p.m., having "stopped for a drink" on the way home. Irene later testified that this occasion was Dr. Keane's office Christmas party.

█ Edith Keane had commenced divorce proceedings against her husband in 1970, and testified that she talked to Raymond Roach about the situation at least half a dozen times that fall. She had also hired a detective agency to conduct surveillance operations on her husband. Over the objection of the defense that this information was privileged, two detectives testified at the trial, and their written reports were introduced. The testimony shows that these reports were requested by and delivered to Mrs. Keane, who paid for them and ultimately turned them over to her divorce attorney. The reports were not related to the rendition of legal services and, therefore, are not covered by any attorney-client privilege. *See:* sec. 902.03, Stats. The defense has not presented any legal authority for excluding this evidence, and we hold that it was properly admitted.[2]

---

[2] Sec. 905.01, Stats.:

"**Privileges recognized only as provided.** Except as provided by or inherent or implicit in statute or in rules adopted by the supreme court or required by the constitution of the United States or Wisconsin, no person has a privilege to:

"(1) Refuse to be a witness; or

"(2) Refuse to disclose any matter; or

"(3) Refuse to produce any object or writing; or

Detective Gloria Worden testified that she observed the Roach apartment on January 30, 1971, and saw Irene Roach and Dr. Keane look out a window at 1:30 a.m. Later, through a transluscent upstairs bathroom window, she saw two "flesh-colored shapes" embrace each other. On her earlier observation, Irene Roach had been wearing a dark-vested dress, and Dr. Keane had been wearing a white shirt and dark coat. Detective June Diehl picked up the surveillance on the next evening, when Irene Roach left and met Dr. Keane at a restaurant parking lot, where Ms. Diehl observed them "kissing and hugging" in Dr. Keane's car. At 12:45 a.m. on March 24, Dr. Keane was admitted by Mrs. Roach to her home; he left an hour and a half later. Again on June 4, 1971, Ms. Diehl observed that Dr. Keane was in the Roach apartment from 12:15 a.m. to 1:15 a.m.[3]

The plaintiff's case was rounded out by testimony from the neighbors. Vernon Lenhart, as the townhouse manager, was charged with keeping an eye on the premises. He testified that during the fall and winter of 1970–71—he wasn't sure of the specific time period—he had observed Dr. Keane's car being driven into the lot outside his home and parking in front of the Roaches', arriving anytime after 10:00 p.m. and leaving between midnight and 6:00 a.m. He saw Dr. Keane himself coming and going. Mr. Lenhart slept with his window open and made a point of responding to noises because of previous thefts. Dr. Keane's nocturnal visits occurred "two or three times a week for sure" during that period. Genevieve Lenhart corroborated her husband's testimony.

"(4) Prevent another from being a witness or disclosing any matter or producing any object or writing."

[3] The record also contains a detective report for March 19, 1971, reporting that Dr. Keane arrived at the Roaches' at 1:15 a.m. to pick up Irene Roach; they went to an undisclosed destination.

Harley Kohl testified that on one occasion he had discovered the Keane car blocking his at 11:00 p.m., and had gone to the Roaches' to ask Dr. Keane to move it. As he recalled it, this occurred before Raymond Roach moved out in January, 1971. He had not seen or heard Raymond Roach in the house on that occasion; Irene later testified that Raymond had been home, but Raymond denied this.

Dr. Keane and Irene Roach flatly denied any improprieties. She testified that Mrs. Keane had actually asked her to take the job as Dr. Keane's office administrator. She stated that Dr. Keane had never "spent the night" at her house, that she had never had sexual relations with him, and that she had never gone anywhere socially with Dr. Keane. She admitted that, because Dr. Keane worked very late hours, he might have "stopped in to give me dictation" as late as 2:00 or 3:00 a.m. during the fall of 1970 and into that winter. She testified that she would type out this dictation then or in the morning; Raymond, however, testified that there was not even a typewriter in the house. Irene admitted meeting Dr. Keane at the restaurant late at night on January 31, as testified to by Detective Diehl, but claimed that she had merely received some business papers from him and denied any "kissing and hugging." She testified that the bathroom window, through which the detective claimed to have seen the flesh-colored figures embrace, was opaquely curtained. Raymond, however, testified that these curtains were tied back.

Dr. Keane testified that, indeed, he worked very long hours, finishing his work anywhere from 9:00 p.m. to 3:00 a.m. He stated that in the course of preparing the next day's work or completing the records for his current work, he would have visited Irene Roach at night, but never as late as 4:30 a.m. He admitted having been there on March 19, 1971, until 1:30 a.m., and having

met Irene Roach at the restaurant on January 31, although he also denied the "kissing and hugging." He stated that he had never been upstairs in the Roach house, had particularly never been in the upstairs bathroom, and had never had sexual relations with Irene Roach. He testified that his relationship with Mrs. Roach was strictly professional.

Supporting Dr. Keane's testimony about his working hours was the testimony of Barbara Rohn, a nurse who observed him "frequently" leaving the hospital late in the evening.

On this evidence, the jury found for the plaintiff as to both alienation of affection and criminal conversation, awarding damages as described above.

*Form of special verdict.*

Appellant Dr. Keane first argues that since the measure of damages for alienation of affection is very similar, if not identical, to that for criminal conversation, the jury should not have been permitted to award separate damages for each tort. The record does not include any transcript of proceedings during which the special verdict was formulated; however, the trial court noted in its decision on motions after verdict that "at the end of the instructions I asked counsel if I read them right and they said yes." Although defendant's motions after verdict included a catchall allegation of "error committed in the trial and instructions," the record of the hearing on those motions reveals no reference by defense counsel to defects in the instructions or special verdict. In sum, there is no evidence that the defendant objected to the special verdict form either before or after it was submitted to the jury.

Under these circumstances, there can be no question that the defendant is not now entitled to assert error. This court has consistently held that failure to

object to the special verdict before it is submitted to the jury waives an appeal of right. *Savina v. Wisconsin Gas Co.* (1967), 36 Wis. 2d 694, 701, 154 N. W. 2d 237; *Mariuzza v. Kenower* (1975), 68 Wis. 2d 321, 327, 228 N. W. 2d 702; *see also: Lisowski v. Chenenoff* (1968), 37 Wis. 2d 610, 623, 155 N. W. 2d 619. Even if the defendant had disputed the special verdict form before it was submitted, he would have no appeal of right unless the error had been raised on motions after verdict with sufficient particularity to demonstrate that the trial court understood the objection. *Calero v. Del Chemical Corp.* (1975), 68 Wis. 2d 487, 497, 228 N. W. 2d 737. Having doubly failed to raise the issue—either before or after the verdict—the defendant Dr. Keane is foreclosed from complaining now about the special verdict form.

*Sufficiency of evidence.*

■■ Appellant Keane argues secondly that, although adultery can be established by circumstantial evidence, the evidence here is so sketchy as to be insufficient. In general, of course, this court will view the evidence in the light most favorable to the verdict, and affirm if there is any credible evidence on which the jury could have based its decision, particularly where the verdict has the approval of the trial court. *Toulon v. Nagle* (1975), 67 Wis. 2d 233, 242, 226 N. W. 2d 480. The credibility of witnesses and the weight given to their testimony are matters left to the jury's judgment, and where more than one inference can be drawn from the evidence, this court must accept the inference drawn by the jury. *Valiga v. National Food Co.* (1973), 58 Wis. 2d 232, 244, 206 N. W. 2d 377; *Calero v. Del Chemical Corp., supra,* 68 Wis. 2d at 508.

■ It has long been recognized that adultery will normally be established by circumstantial evidence. In *Molloy v. Molloy* (1970), 46 Wis. 2d 682, 684, 176 N. W.

2d 292, this court discussed at length the level of circumstantial evidence required to establish adultery in a divorce action, concluding that to justify a finding that adultery occurred there must be "clear and convincing" evidence of (1) an adulterous inclination and (2) an opportunity under circumstances from which a reasonable person could infer that the act occurred.

In the present case, the direct evidence that Mrs. Roach and Dr. Keane had adulterous inclinations is limited to Raymond Roach's testimony that he saw Dr. Keane's arm around her in a restaurant, Detective Worden's testimony concerning the flesh-colored shapes in the bathroom window, and Detective Diehl's testimony about the kissing and hugging in the parking lot. Other evidence consists only of the uncertain observations of the neighbors. There is a large gap in the evidence insofar as Raymond, according to his own testimony, was home evenings during the fall of 1970; there was no testimony that his business required him to travel then. As a result, there is no evidence that, until Raymond moved out in January, 1970, Dr. Keane and Irene had any more opportunity to associate improperly than people working closely together would normally have. A necessarily close professional relationship cannot alone justify a finding of adultery.

After Raymond's departure, however, and until the divorce decree became final one year after its entry on January 25, 1971,[4] there was ample opportunity for association between Dr. Keane and Irene Roach. Considering particularly the detectives' testimony, the jury could reasonably find both opportunity for and inclination toward adultery. This court cannot say that there is such an absence of credible evidence as to require that the jury's finding that criminal conversation did occur be overturned.

[4] *See:* sec. 247.37, Stats. 1969.

*Damages.*

■ Dr. Keane argues that the damages awarded by the jury—a total of $30,000—are excessive in light of the Roaches' tumultuous marital history. In *Alaimo v. Schwanz* (1972), 56 Wis. 2d 198, 204, 201 N. W. 2d 604, this court found excessive a jury award of $15,000 compensatory damages for alienation of affection, in a situation where the plaintiff's wife had previously sued for divorce several times, and had had physically violent disputes with the alienated husband:

"This court has said that there 'is no measuring stick by which to set a value of consortium, love and affection.' It follows that damages recoverable in an alienation of affections suit are 'peculiarly within the province of the jury.' However, this is not to be read as meaning that it makes no difference whether the marital relationship interfered with was a pleasant, tranquil and fulfilling one, or one marked by frequent episodes of violence, separations, calls to the police to prevent mayhem, or visits to the divorce court. What was in the store before it was burglarized at least sets a limit to what could have been burglarized.

"The general rule applicable in this state has been stated to be: 'Generally speaking, all the facts and circumstances that go to show a reduction in the amount necessary to compensate the plaintiff on account of the wrong for which suit is brought may be shown in mitigation of damages. This principle applies in an action for alienation of affections. . . . Among the facts and circumstances that may be shown and considered as tending to mitigate or lessen damages are lack of affection, indifference, or repugnance on the part of the plaintiff's spouse toward the plaintiff, and unhappy marital relations, before the relationship with defendant. . . .' "

This court is reluctant to interfere with jury damage awards. *Calero v. Del Chemical Corp., supra,* 68 Wis. 2d at 509, cited a passage in *Bethke v. Duwe* (1950), 256 Wis. 378, 384, 41 N. W. 2d 277, quoting 15 Am. Jur., *Damages,* p. 621, sec. 705:

" 'Since it is for the jury, and not for the court, to fix the amount of the damages, their verdict in an action for unliquidated damages will not be set aside merely because it is large or because the reviewing court would have awarded less. Full compensation is impossible in the abstract, and different individuals will vary in their estimate of the sum which will be a just pecuniary compensation. Hence, all that the court can do is to see that the jury approximates a sane estimate, or, as it is sometimes said, see that the results attained do not shock the judicial conscience. . . .' "

Where the trial court has reviewed the evidence and approved the damage award, this court is especially loathe to interfere. *Kobelinski v. Milwaukee & Sub. Trans. Corp.* (1972), 56 Wis. 2d 504, 525, 202 N. W. 2d 415. In the present case, however, the record shows that the trial court did not analyze the evidence in affirming the jury award, and this court may properly proceed to determine whether the evidence supports a total of $30,000 damages. *Tills v. Elmbrook Memorial Hosp.* (1970), 48 Wis. 2d 665, 676, 180 N. W. 2d 699.

The general rule for appellate review of damage awards, as for other factual questions, is that any credible evidence of the damage claimed is sufficient to sustain the jury's award. *Puls v. St. Vincent Hospital* (1967), 36 Wis. 2d 679, 693, 154 N. W. 2d 308; *Hein v. Torgeson* (1973), 58 Wis. 2d 9, 20, 205 N. W. 2d 408. However, where the award reflects injuries not proved or a rate of compensation beyond reason, this court can find the damages excessive even in the absence of jury perversity.[5] In such cases the court will offer the plaintiff a reasonable amount of damages and the option of a new trial on the issue of damages, pursuant to *Powers v. Allstate Ins. Co.* (1960), 10 Wis. 2d 78, 90, 102 N. W.

[5] *Makowski v. Ehlenbach* (1960), 11 Wis. 2d 38, 42, 103 N. W. 2d 907. For discussion of "perverse" verdicts, *see: Redepenning v. Dore* (1972), 56 Wis. 2d 129, 134, 201 N. W. 2d 580.

2d 393, and *Malco v. Midwest Aluminum Sales, Inc.* (1961), 14 Wis. 2d 57, 109 N. W. 2d 516.

In the present case, the plaintiff demonstrated no pecuniary damage whatsoever; no evidence was introduced to show that he lost wages or incurred medical expenses, or that the divorce settlement resulted in additional financial burdens. In fact, the only demonstrated pecuniary aftereffect of this affair is that Raymond Roach's income rose by 20 percent. Nor is there any evidence that he suffered any embarrassment, humiliation, or loss of social standing or reputation as a result of the Keane affair. The sole evidence of injury was his own testimony that he had been emotionally shocked and hurt by his wife's defection. However, an aggregate award of $17,500 in compensatory damages for his injured feelings reflects a "rate of compensation which is beyond reason," *Makowski, supra,* in light of the low value Mr. Roach had previously placed on the marriage relationship. As in *Alaimo, supra,* the value placed on the marriage by Mr. Roach sets an outer limit on the injury he may have suffered. Long ago in *Ward v. Thompson* (1911), 146 Wis. 376, 380, 131 N. W. 1006, the measure of damages for criminal conversation was well expressed:

"A number of questions enter into the consideration as to what sum of damages should be assessed. Among such questions are these: What is the moral attitude of the plaintiff towards the marriage tie? Does he regard it as a sacred, binding tie, or does it rest but lightly upon him? Does he respect the sacredness of that tie between others, or is he ready to trespass upon it if opportunity offers? The same questions apply equally to his wife, for a double reason. In the first place, they have a direct bearing upon her value as a wife to plaintiff, and, in the second place, they also have a direct bearing upon the *quantum* of guilt of the defendant in seducing her—a vital issue as to punitory damages. So, also, the fact as to whether or not the married life of plaintiff and his wife was a happy one is at issue."

██ On the basis of the overwhelming evidence of Mr. Roach's prior attitude toward his marriage, we conclude that he is reasonably entitled to compensatory damages of $500 for criminal conversation. The appropriate level of punitive damages is dependent on the culpability of Dr. Keane, the outrageousness of his acts, and his ability to pay, as well as on the degree of harm.[6] Where the culpable act is subject to criminal sanctions, this court has held that a criminal fine is relevant for comparative purposes.[7] Section 944.16, Stats., provides a fine for adultery of not more than $1,000. The present award of $10,000 punitive damages by the jury is clearly excessive, and even the statutory maximum fine would be excessive in this case. The record contains no evidence that Dr. Keane was an insensitive homewrecker, that he hired Mrs. Roach with any illicit intentions, that he pursued her against her wishes, or that he had any malicious intentions. We determine that $100 is a reasonable amount of punitive damages.

██ Likewise, the damages awarded to Raymond Roach for the alleged emotional shock of the alienation of affection must be viewed in the light of his previous insensitivity. Assuming that Dr. Keane was responsible for the divorce—a jury finding which Dr. Keane does not now dispute—some damages are justified on the basis of Mr. Roach's undisputed testimony that the marriage was experiencing a period of tranquility just before the Keane affair. However, on the record here the jury's award of $7,500 in compensatory damages is excessive; we determine that a reasonable amount would be

[6] *Lisowski v. Chenenoff* (1968), 37 Wis. 2d 610, 633, 155 N. W. 2d 619; *Dalton v. Meister* (1971), 52 Wis. 2d 173, 180, 188 N. W. 2d 494.

[7] *Lisowski, supra,* 37 Wis. 2d at 634; *Meke v. Nicol* (1973), 56 Wis. 2d 654, 664, 203 N. W. 2d 129; *Calero, supra,* 68 Wis. 2d at 511.

$2,000. There is no basis for disturbing the jury's award of $2,500 in punitive damages, considering the jury's discretion in this matter, and Dr. Keane's income.

All of these awards are made under the *Powers* rule, which affords Raymond Roach the option of a new trial on the damage issues.

*Appeal procedures.*

Respondent Roach points out correctly that appellant's brief fails to comply with the requirements of sec. 251.34 (5), Stats., concerning the appendix: Appellant Keane failed to print the trial court's decision on motions after verdict, and provided an inadequate and one-sided summary of the testimony, omitting any mention of, for example, the testimony of the neighbors concerning Dr. Keane's visits to the Roach home. Appellant also failed utterly to comply with sec. 251.34 (3), requiring a "clear and concise" statement of facts; appellant's brief states virtually no facts at all in a case turning entirely on factual questions.

Respondent is, therefore, awarded the costs of printing the supplemental appendix provided in his brief. Appellant is, additionally, denied costs associated with the appeal. This court has recognized the propriety of imposing double costs on a defeated party who violates sec. 257.34 (5), Stats., *Vonasek v. Hirsch & Stevens, Inc.* (1974), 65 Wis. 2d 1, 16, 17, 221 N. W. 2d 815, and denial of costs to a victorious party who violates sec. 251.34 (5), *Bigley v. Brandau* (1973), 57 Wis. 2d 198, 209, 203 N. W. 2d 735.

*By the Court.*—Judgment reversed, and cause remanded for a new trial on the issue of damages, or, if the plaintiff so elects within 20 days of remittitur, for the entry of judgment in the amounts fixed in this opinion.