VAN GHEEM, Appellant, v. CHICAGO & NORTH WESTERN RAILWAY COMPANY and others, Respondents.

*November 29, 1966—January 3, 1967.*

232

234

For the appellant there were briefs by *Ralph Stovic* and *Kaftan, Kaftan & Kaftan,* all of Green Bay, and oral argument by *Robert Kaftan.*

For the respondents there was a brief by *Welsh, Trowbridge, Bills, Planert & Gould* of Green Bay, and by *Wickham, Borgelt, Skogstad & Powell* of Milwaukee, and oral argument by *Richard J. Gould.*

BEILFUSS, J.   The issues before us are:

(1)   Was the trial court's order granting a new trial in the interests of justice clearly an abuse of discretion?

(2)   Did the trial court err in refusing to include special verdict questions and instructions regarding negligence as to lookout on the part of the railroad?

(3)   Did the trial court err in refusing to instruct on camouflage?

The trial court summarized its reasons for granting a new trial in the interests of justice as follows:

"(a)   The award of $50,000 for plaintiff's personal injuries, in answer to subdivision (c) of the Sixth Question of the verdict, is grossly excessive, reflects passion and prejudice, and is perverse on the subject of such damages.

"(b)   The award of $4,000 for impairment of earning capacity, in answer to subdivision (b) of the Sixth Question of the verdict, is also grossly excessive, reflects passion and prejudice, and is likewise perverse on the subject of such damages.

"(c)   It appears that elements of passion and prejudice have also entered into, and have affected, the finding of the jury with respect to the comparative negligence question, and this is part of the perversity which has permeated the verdict."

The standard for review of an order for a new trial in the interests of justice is that the supreme court will affirm the order unless there is a clear showing of abuse of discretion. In *Schlag v. Chicago, M., & St. P. R. Co.* (1913), 152 Wis. 165, 169, 170, 139 N. W. 756, this court stated:

". . . this court is very loath to interfere with the discretion to grant new trials that is vested in circuit judges. It is a power that should be courageously and fearlessly exercised whenever a trial judge is convinced that to enter judgment on a verdict returned would result in a miscarriage of justice. It is very possible that this important power is used more sparingly than it should be. However this may be, it is only in a clear case of an abuse of discretion that this court will interfere."

In *McFarlin v. Hewitt* (1958), 5 Wis. (2d) 488, 493, 93 N. W. (2d) 445, Mr. Chief Justice MARTIN, writing for the court, said:

"In cases where a new trial has been granted in the interests of justice under sec. 270.49 (2), Stats., this court does not look for evidence to sustain the jury findings, but it seeks to determine whether the trial court abused its discretion in ordering a new trial. It seeks reasons to sustain the finding of the trial judge."

Recent cases buttress the proposition that an order granting a new trial in the interests of justice will be reversed only where there clearly is an abuse of discretion. *Bair v. Staats* (1960), 10 Wis. (2d) 70, 76, 102 N. W. (2d) 267; *Flippin v. Turlock* (1964), 24 Wis. (2d) 49, 54, 55, 127 N. W. (2d) 822; *McPhillips v. Blomgren* (1966), 30 Wis. (2d) 134, 138, 139, 140 N. W. (2d) 267.

The plaintiff argues that the order in this case does not have this discretionary nature because of three errors of law by the trial court: (1) Finding the defendants not causally negligent as to lookout as a matter of law; (2) failure to instruct on a camouflage phenomenon asserted to have confronted the plaintiff; and (3) refusal to admit into evidence pictures and testimony

relating to the alleged camouflage situation. In support of this argument the following statement from *Huebner v. Fischer* (1939), 232 Wis. 600, 603, 288 N. W. 254, is cited:

"While an order for a new trial in the interest of justice is highly discretionary [cases cited], it ceases to be so when a trial court's views are grounded upon an erroneous view of the law."

As recently as 1963, Mr. Justice GORDON restated the rule in speaking for the court in *Halsted v. Kosnar* (1963), 18 Wis. (2d) 348, 354, 118 N. W. (2d) 864:

"A new trial in the interests of justice is discretionary, but it may be upset on appeal where it is based on an erroneous conception of the law."

It is most significant that the trial court's order for a new trial is not "grounded" or "based" upon any of the alleged errors of law asserted by the plaintiff. The grounds for the court's order are that damages are grossly excessive, and that the verdict reflects passion and prejudice and is perverse. Thus, even if the plaintiff is correct that the court was in error on the three items he asserts, he has not asserted or shown any respect in which the court's order was "grounded" or "based" on an erroneous conception of the law. This being so, this court must not upset the order for a new trial unless it is "a clear case of an abuse of discretion."

In their briefs counsel for both sides have benefited the court with an exhaustive review of the evidence. The plaintiff argues that the evidence supports the verdict. The railroad argues that the evidence supports the finding that the verdict was perverse. Both of these approaches seem to ignore the discretionary nature of the order. In reviewing such orders, we stated in *McFarlin v. Hewitt, supra:*

". . . this court does not look for evidence to sustain the jury findings, . . . It seeks reasons to sustain the finding of the trial judge."

In light of the foregoing, we examine the reasons given by the trial judge for his order granting a new trial. To review, those reasons were: (1) The $50,000 award for personal injuries was grossly excessive, perverse, and reflected passion and prejudice; (2) the $4,000 award for impairment of earning capacity was grossly excessive, perverse, and reflected passion and prejudice; (3) the passion, prejudice and perversity entered into and affected the finding of the jury with respect to the comparative-negligence question.

The detailed and well-reasoned opinion of the trial court sets forth the evidence and discusses the reasons for concluding the damages were excessive and the verdict perverse.

The testimony established that the plaintiff was twenty-five years old and was working on a farm in return for his room and board at the time of the accident. Previously he had been employed at Reimer's meat market for about a month at a rate of $1.25 per hour, and at the Lawton Company (as a mechanic) for about three to four years. When he left his job at Lawton in October of 1962, he was receiving $2.10 per hour. After the accident the plaintiff did not work at all for three months and did some light work around the farm for the next three months. Six months after the accident plaintiff returned to work full time at various jobs paying from $1.50 to $1.70 per hour and was working at the time of trial, except for a substantial period in which he was recovering from a second and subsequent accident. The special verdict asked the jury to assess these damages from the date of the accident until the date of the trial. In part, the court reasoned as follows:

"In his argument to the jury, counsel for plaintiff mentioned, as an example, that the award for impairment of earning capacity could be $1,200. In making this suggestion to the jury, plaintiff's counsel used a period of 20 weeks, representing the period of time from Decem-

ber 29th, 1962 (the date of the railroad accident), until June, 1963, when the plaintiff started to work for Olson's Body and Trailer. He also used the amount of $1.50 per hour, on a *40-hour-per-week basis,* as his method of computing an award of $1,200 for the 20-week period.

"The fact that the jury made an award *more than three times higher* than the amount suggested by counsel for plaintiff is one of the reasons why, in my opinion, the award of $4,000 is not only grossly excessive but reflects sympathy for plaintiff or prejudice against defendants, constituting perversity.

"`. . .`

"The jury must have decided that impairment of plaintiff's earning capacity continued beyond June of 1963, if there is to be any justification at all for the award of $4,000. However, the evidence establishes that plaintiff worked for Olson's from June to September, 1963, at the rate of $1.70 per hour; then worked for Al's Sinclair Service Station for 'about a month' and apparently at the rate of $1.50 per hour; next worked for Erv's Cities Service Station for 'about three months'; and apparently worked for Strebel's Small Engine Service continously since January, 1964, where he was earning $1.50 per hour at the time of trial. If the jury found that impairment of plaintiff's earning capacity existed from the date of the accident to the date of trial, the finding would, in the first place, be contrary to the evidence, and the amount of the award would still be excessive, in view of the earning capacity of plaintiff before the collision and the extent to which it was impaired as a natural consequence of the injuries received, as shown by the credible evidence.

"As a matter of fact, in view of the award of $4,000, I am inclined to suspect that the jury may have decided that impairment of plaintiff's earning capacity would continue into the future beyond the date of trial. . . ."

Among others, the court gave these additional reasons for its finding on this point:

"The question of the jury, 'Couldn't that go on as long as he lives?' prompts me to believe that up to that point the jury may not have been guided by the original instruction and may have, despite the re-instruction,

made an allowance beyond the date of verdict in arriving at the sum of $4,000.

". . .

"The last employment which plaintiff had, prior to the accident, was that of a farm hand at the Robertson farm. He received only his room and board from October, 1962, to December 29th, 1962. *There was no testimony as to the monetary value of the room and board* which plaintiff earned for his services.

"According to the evidence which was presented, the highest amount which plaintiff earned, for one hour, prior to the accident was $2.10. If the jury believed there was total impairment of earning capacity for 20 weeks and allowed plaintiff $2.10 per hour, and *assumed* that he would have worked 40 hours per weeek, it would amount to $1,680.00."

The trial court's reasoning is exhaustive and equally cogent on the subject of damages for loss of earning capacity. The conclusion that $4,000 was grossly excessive, perverse, and that it reflected passion and prejudice seems hardly a clear case of abuse of discretion.

Because it clearly appears that the trial court did not abuse its discretion on the question of loss of earning capacity, and because the court found that perversity permeated the verdict, this court actually need go no further in order to affirm the order of the trial court. As the court said in *Lines v. Milwaukee* (1911), 147 Wis. 546, 547, 133 N. W. 592:

"Indeed, where the answer to one question in a special verdict indicates that the jury were actuated by passion and prejudice in returning such answer, it is the duty of the court to set the verdict aside, unless satisfied that the passion and prejudice affected only that particular question. 'If it appears that the elements of passion and prejudice may have entered into, and probably did affect, the decision of other questions in the case, the court's duty is to grant a new trial absolutely.' "

However, it should be noted that the trial court substantiated its other reasons for granting a new trial with at least equal diligence. With regard to the finding of

excessive damages for personal injuries, the judge thoroughly reviewed the testimony. He noted the plaintiff had been seriously injured, sustaining fractures to the third, fourth and fifth transverse lumbar processes, nondisplaced fractures of the ninth and tenth ribs posteriorly, and a ruptured spleen, which was removed by surgery. The plaintiff also sustained a partial collapse of the right lung. Residuals included a five percent loss of vital capacity of the injured lung, scar tissue in the area of the fractured transverse process which could cause pain in lifting or bending, and possible headaches. The court also noted that the plaintiff was hospitalized for only twenty days, that he never received any medical treatment for his back, that he began to work at jobs requiring physical activity within about six months of the accident, and that since the accident the plaintiff had only consulted his family doctor twice and a specialist once regarding injuries resulting from the accident. The trial judge was particularly impressed by the evidence about a very serious accident which plaintiff had had within eleven months after the accident underlying this action. The trial court was convinced that the award was founded to a great extent upon sympathy for plaintiff rather than upon the evidence. In light of this reasoning, the trial court's finding on this issue is not a clear-cut abuse of discretion.

There is no need to set out here the trial court's reasoning on the perversity of the comparative-negligence part of the verdict. Suffice it to say that the memorandum decision demonstrates that the court has reviewed the evidence and articulated its reasons.

In sum, the trial court's order granting a new trial in the interests of justice sets forth sufficient reasons and does not clearly appear to be an abuse of discretion.

At this juncture, it should be noted that the plaintiff has requested that if this court agrees with the trial court that the damages are excessive, he would prefer a reduction of damages to a new trial. Apparently plain-

tiff wants the court to apply the rule of *Powers v. All-state Ins. Co.* (1960), 10 Wis. (2d) 78, 102 N. W. (2d) 393, wherein the court can fix reasonable damages as an alternative to a new trial. However, the order in the instant case is based upon the perversity and prejudice of the jury. The *Powers* rule explicity does not apply to cases where an excessive verdict is due to perversity or prejudice. *Powers, supra,* at pages 91, 92.

Although we affirm the trial court's order for a new trial, the plaintiff has raised two additional issues which should be considered—the railroad's negligence as to lookout and a camouflage problem.

On December 29, 1962, between 9:30 and 10 p. m., the plaintiff, with three passengers, was driving south on Highway 41 between Green Bay and De Pere and intended to turn left on an intersecting road known as Hansen road. Highway 41 is a four-lane divided highway running north and south, with two lanes for traffic proceeding north and two lanes for traffic proceeding south. Hansen road is a regular two-lane highway which runs east and west and intersects Highway 41. The railroad track is parallel to Highway 41 and intersects Hansen road. The track is about 70 feet east of the most easterly part of the intersection of Highway 41 and Hansen road and about 125 feet east of the easterly part of the median strip separating the two segments of Highway 41. For a considerable distance north of Hansen road the railroad track is parallel and in close proximity to Highway 41.

The plaintiff turned left and stopped at the east edge of the median strip of Highway 41, rolled down the window and looked to the north as well as to the south. After waiting for cars coming from the south to pass the intersection he proceeded across the east portion of Highway 41 into Hansen road. At about 50 feet from the railroad crossing he rolled up his window and proceeded to the crossing at a speed of 10 to 15 miles per hour.

The engine crew consisted of three men, the engineer, fireman, and conductor. The diesel engine was not pulling or pushing any other cars, was not on a regular schedule but traveling south at a speed of 25 miles per hour to pick up a disabled engine. Although the train crew testified to the contrary, the jury found, upon sufficient credible evidence, that neither the bell nor the whistle of the train had been activated. Admittedly none of the train crew saw the plaintiff's vehicle before the impact. The conductor and fireman were on the left side of the engine and their view was partially blocked by the front of the engine; however, the engineer was on the right side and had an unobstructed view of the entire scene for at least several hundred yards.

Counsel for plaintiff requested that the special verdict include a question on the causal negligence of the railroad as to lookout, this question to be answered only in the event that the jury first find the railroad causally negligent in failing to give warning by bell or whistle. Counsel also requested proper instructions on the subject. The court refused these requests and held that the railroad was not causally negligent as to lookout as a matter of law on the basis of *Hynek v. Kewaunee, G. B. & W. R. Co.* (1947), 251 Wis. 319, 29 N. W. (2d) 45, and *Dombeck v. Chicago, M., St. P. & P. R. Co.* (1964), 24 Wis. (2d) 420, 129 N. W. (2d) 185.

*Hynek* and *Dombeck* stand for the rule that although a railroad may be negligent as to lookout in approaching a crossing which an automobile is approaching at a slow rate of speed, that negligence as a matter of law may not be causal because the engine crew has a right to assume that the driver of an automobile traveling at a comparatively low rate of speed toward a grade crossing will stop his automobile in a place of safety. *Hynek, supra,* at page 322; *Dombeck, supra,* at pages 426–430. This proposition is based upon the physical fact that trains confronted with an emergency cannot effectively slow down or stop within a short distance and upon the duty of the

driver of the car to look and listen before crossing the railroad track.

The plaintiff contends that the court erred in finding no causal negligence as a matter of law where the jury finds that the railroad has violated its statutory duty to give audible warning when approaching a grade crossing. In *Gallagher v. Chicago & N. W. R. Co.* (1949), 255 Wis. 15, 18–20, 37 N. W. (2d) 863, 39 N. W. (2d) 778, the court explained a case in which the rule of *Hynek* does not apply:

"The testimony of the fireman was that he saw the car and immediately sounded the whistle at one hundred fifty feet from the crossing. At twenty-five or thirty miles per hour this would mean that the train was at that time four seconds from the crossing. It appears to us that the jury could conclude upon this evidence that since the whistle was not blown until a fraction of a second before the collision the lookout of the fireman was neither adequate nor timely.

". . .

"No objection is made to the instruction on the lookout to be exercised by the automobile driver but it is claimed that the court erred in refusing to give certain instructions requested by the defendant as especially applicable to an employee in charge of a railroad train. The principal difference between the instructions given by the court as applicable to the driver and those requested is that the latter were to the effect that the engineer and fireman had a right to assume that the driver of an automobile 'traveling at a comparatively slow rate of speed toward a grade crossing will stop his car in a place of safety.' The requested instruction was largely an expression found in *Hynek v. Kewaunee, G. B. & W. R. Co.* 251 Wis. 319, 29 N. W. (2d) 45, but it appears to us not to be applicable here where the fireman claims to have instantaneously sounded the whistle upon seeing the Olson car and where the jury had a right to believe that an earlier observation would have resulted in an earlier warning."

In this instance where the jury found that the railroad crew neither rang the bell nor blew the whistle to

warn of the approach of the train, the jury could conclude that efficient lookout would have revealed the presence of the plaintiff in time to warn the plaintiff or even to have stopped or appreciably slowed the engine. Under these circumstances it was error not to have included lookout on the part of the train crew in the verdict, together with the requested instruction.

The plaintiff contends that he was confronted with a camouflage situation in regard to which the trial court made several errors at trial. In this case the railroad tracks run north and south; Hansen road runs east and west. Before the collision the plaintiff was traveling east approaching the crossing from the west. It was shortly before 10 p. m. on a clear winter evening. Just northeast of the intersection of Hansen road and the tracks is the Brebner Machinery Company, which has a large outdoor yard in which large pieces of road equipment, such as bulldozers and road graders, are displayed. The yard is lighted at night with floodlights. The equipment is mostly painted yellow and green, the same colors as the switch engine. The switch engine had a very bright nonoscillating headlight which shone steadily down the track. The plaintiff testified that when he was about 50 feet west of the track he looked north to look out for a train. His speed was 10 to 15 miles per hour. The train was approaching from the north at about 25 miles per hour. Thus, at the point of plaintiff's last observation, it is quite possible that the engine was between the plaintiff and the Brebner yard.

The plaintiff asserts that the background of bright yard lights and the road machinery presented plaintiff with a camouflage situation which would tend to diminish plaintiff's negligence in failing to see the railroad engine. With respect to this situation plaintiff asserts that the court made the following errors: The trial court refused to admit a night color photograph of the Brebner yard which was supposed to show the intensity of the lights; it refused to admit the testimony of one Mc-

Tavish, Brebner's night maintenance man, with respect to the intensity of the yard lights; it refused to instruct on camouflage.

The court's refusal to admit the photograph was based upon a lack of proper foundation. The nighttime colored picture could have been distorted by the exposure time of the film. It was not an abuse of discretion to exclude the exhibit.

The objection to the testimony by the machinery yard manager as to the intensity of the lights was sustained upon the ground that the testimony was immaterial. It was the opinion of the trial court that the plaintiff should have seen the light of the engine long before it was in such proximity to the display lights that confusion as to the lights could exist. It is undisputed that the plaintiff was stopped at the median strip and that the engine was not in the immediate vicinity of the display lights at that time. It was not error to exclude this testimony.

The trial court was of the opinion that the display lights of the machinery company could not have confused the plaintiff at the time he exercised a lookout, because at the time he first looked to the north the light of the train could not have been in front of or in the vicinity of the display lights. The plaintiff also testified that he knew of the display lights and the presence of large pieces of machinery in the display lot and that he did not look to the north during the period he traveled the last 50 feet before entering the crossing. Under these circumstances it was not error to exclude the testimony as to the intensity of the lights nor to refuse to give the jury the requested camouflage instruction.

*By the Court.*—Order affirmed.