Regena HERMAN, a minor, by Guardian ad Litem, Ted M. Warshafsky; Gene Herman; Nancy Herman; and Wisconsin Employers Insurance Company, Plaintiffs-Respondents, and Cross-Appellants,

v.

MILWAUKEE CHILDREN'S HOSPITAL, a Wisconsin non-profit organization; and Wisconsin Hospital Association Optional Segregated Account, Defendants-Respondents, Co-Appellants and Cross-Respondents,

WISCONSIN PATIENTS COMPENSATION FUND, Defendant and Third-Party Plaintiff-Appellant,

Marvin GLICKLICH, M.D.; Steven Kappes, M.D.; and Wisconsin Health Care Liability Insurance Plan, Third-Party Defendants-Respondents.†

Court of Appeals

*No. 83–1450.  Submitted on briefs October 17, 1984.—*
*Decided November 19, 1984.*
(Also reported in 361 N.W.2d 297.)

† Petition to review denied.

534

For defendants-respondents, co-appellants and cross-appellants Milwaukee Children's Hospital and Wisconsin Hospital Association Optional Segregated Account the cause was submitted on the briefs of *Purtell, Purcell, Wilmot & Burroughs, S.C.,* with *John A. Nelson* of counsel, of Milwaukee.

For the defendant and third-party plaintiff-appellant Wisconsin Patients Compensation Fund the cause was submitted on the briefs of *Kasdorf, Dall, Lewis & Swietlik, S.C.,* with *John M. Swietlik* and *Michael A. Mesirow* of counsel, of Milwaukee.

For plaintiffs-respondents and cross-appellants the cause was submitted on the briefs of *Warshafsky, Rotter, Tarnoff, Gesler & Reinhardt, S.C.*, with *Ted M. Warshafsky* of counsel, of Milwaukee.

For third-party defendants-respondents Marvin Glicklich, M.D., Steven Kappes, M.D. and Wisconsin Health Care Liability Insurance Plan the cause was submitted on the briefs of *James G. Doyle* and *Timothy J. Strattner* of Milwaukee.

Before Wedemeyer, P.J., Moser and Sullivan, JJ.

SULLIVAN, J.  The Wisconsin Patients Compensation Fund (the Fund) appeals from a judgment awarding more than $3,000,000 to Regena Herman (Regena) and her parents, Gene and Nancy Herman. Milwaukee Children's Hospital co-appeals from that judgment. Regena, Gene and Nancy Herman and Wisconsin Employers Insurance Company (collectively, the Hermans) cross-appeal from the same judgment. We reverse on the ground of excessiveness the award to Regena of $2,609,-000 for past and future pain, suffering and disability. We also reverse the award to the Hermans of $30,000 for past and future services rendered to Regena on the ground that there was a failure of proof as to the value of such services. Finally, we hold that the trial court erred in not incorporating into the judgment the limitation of sec. 655.27 (5) (d), Stats., to the effect that when the Fund incurs liability exceeding $1,000,000 to any person under a single claim, the Fund shall not pay more than $500,000 per year on the claim. We modify the judgment to reflect the statutory mandate. On all other issues, we affirm.

Regena, then age ten, underwent surgery at Milwaukee Children's Hospital on July 8, 1980, to correct idiopathic thrombocytopenic purpura, or a tendency to bleed. The surgical procedure, a splenectomy, was performed by Dr. Glicklich; it went routinely. Dr. Glicklich left the hospi-

tal at 5:15 p.m.; Regena was in the recovery room. Dr. Glicklich left an order that he should be called if Regena's blood pressure dropped below 90/60.

Regena was stable at 11:00 p.m. that evening. At midnight her pulse was recorded as being 116, abnormally high, and she complained of discomfort from a tube in her nose. In the early hours of the morning Regena became uncomfortable. Her mother, who was staying in the room with her, complained to nurse Wall some time before 2:00 a.m. that Regena was awake, sweaty, and in pain. Nurse Wall observed that Regena was restless and pale; Wall could not get Regena's blood pressure reading with a cuff and stethoscope. Rapid pulse, perspiration, pallor, clammy skin and a drop in blood pressure are signs indicating shock. Wall considered the possibility of internal bleeding. Wall then requested that nurse Gerhardt look at the child. Gerhardt could not get a blood pressure reading either. Gerhardt requested that nurse McDermott help Wall with getting a blood pressure reading. McDermott could not get a blood pressure reading with a cuff. She then tried an instrument called a doppler, used to measure blood pressure in infants. The bottom, or diastolic, number will not be heard with a doppler. Regena's blood pressure was 40/0, a reading which, in a ten year old, indicates shock.

Within a few minutes of her first unsuccessful attempt to get a blood pressure reading, nurse Wall called Dr. Kojima, a first year surgical resident in his first week of service and on his first night on call. Kojima had been instructed to call Dr. Glicklich, who was the chief of the Department of General Surgery, or Dr. Kappes, the senior resident, in case of an emergency. Kojima, himself, had virtually no surgical skills.

Kojima arrived shortly after 2:00 a.m. at which time Regena was still conscious and able to follow commands. Kojima ordered a blood count. While waiting for the re-

sults, Kojima called Dr. Kappes, who told Kojima he was doing the right thing. The blood test results showed a loss of blood. Kojima called Kappes again, and Kappes said he was coming to the hospital.

Regena had had an intravenous line in the vein in her arm since before her surgery. Kojima tried to get an additional I.V. line going to give Regena a blood transfusion. However, when a patient is in shock, it is difficult to find a vein. When a vein cannot be found, a cutdown (cutting through the skin to reach the vein) must be performed. Kojima did not know how to do a cutdown. Kojima called another resident, Dr. Fontaine, who also could not do a cutdown. No effort was made to seek the help of other physicians in the hospital at the time who could have performed a cutdown. Dr. Humphrey, a third year resident, and Dr. Witte, a second year resident, were both available and knew how to do cutdowns, but were never called.

Regena's intra-abdominal bleeding caused her to go into hypovolemic shock and then to suffer a cardiac arrest at 3:05 a.m. Her low blood volume caused a decrease in oxygen flow to the vital organs, resulting in the production of lactic acid and damage to the brain.

Dr. Kappes arrived and performed two cutdowns. Units of blood were administered to Regena at 3:12 a.m. and 3:20 a.m. Dr. Glicklich operated on Regena at 3:40 a.m. to find the origin of the bleeding, a leak in a ligature of a splenic artery, and to stop it.

Regena's preinjury IQ was 100 to 110; her present IQ is approximately 85, or "dull normal." Since the injury, she is deficient in general intellectual functioning, attention span, mathematical ability, three dimensional perception, memory and reconstruction, motor coordination, and judgment skills. She has epilepsy, weakness in her left arm and leg, balance problems, and reduced bone growth in her left leg, causing it to be three-eighths of an inch shorter than the right leg. The emotional quality

of Regena's speech has been reduced, and she repeats statements. Regena is aware that she is now a different person than she was before the injury.

The Hermans made a negligence claim against Children's Hospital which was heard by a patients compensation panel. The panel found that Children's Hospital was negligent and awarded $17,500 for medical and hospital expenses; $40,000 to the Hermans for the loss of Regena's companionship, services and earning capacity during minority; $15,000 to the Hermans for future nursing and custodial services; $130,000 to Regena for future lost earning capacity; and $60,000 and $200,000 to Regena for past and future, respectively, pain and suffering.

Regena and the Hermans then filed the suit giving rise to this appeal. Children's Hospital filed its answer, as did the Fund. Subsequently, the Fund filed a third-party complaint joining Drs. Glicklich and Kappes and their insurer. Children's Hospital filed a cross-claim against the same parties. A jury trial was held from March 28, 1983, through April 21, 1983.

Counsel for Regena and the Hermans requested in closing argument that the jury award Regena $302,000 for loss of earning capacity, $25,000 for the first year of pain and suffering, and from $600,000 to $900,000 for future pain, suffering and disability. The jury found Children's Hospital, alone, causally negligent and awarded to Regena $2,609,000 for past and future pain, suffering and disability and $281,917 for future loss of earning capacity. The jury awarded the Hermans $350,000 for loss of society, companionship and earning capacity during the child's minority and $30,000 for services that must be rendered to Regena because of her injuries. The court found that Regena's medical expenses amounted to $18,579.70.

On motions after verdict the Fund requested that the answers to the negligence questions be changed, requested alternatively a new trial or that all parties be

found causally negligent, and requested that any judgment against it be limited pursuant to sec. 655.27(5)(d), Stats. The court denied the motions and ordered judgment on the verdict. Judgment was entered and the Hermans filed a bill of costs. The Fund objected. After a hearing, and slight changes in the award of costs, amended judgments were entered which awarded damages and costs and limited the liability of Children's Hospital to $200,000 in accordance wtih sec. 655.23(5), Stats. The Fund appealed; Children's Hospital co-appealed on designated issues. Regena and the Hermans cross-appealed from the portion of the judgment limiting the liability of Children's Hospital to $200,000.

On the Fund's motion to stay execution pending appeal, the court ordered the filing of an undertaking, or bond, of $4,000,000, as a condition of the stay. The Fund filed with this court a motion for relief from the bond requirement pending appeal. As the issue will be moot when this opinion is released, we will not address its merits herein, and we deny the motion.

## SUFFICIENCY OF THE EVIDENCE—LIABILITY

The Fund's first argument is that the verdict findings of negligence by Children's Hospital and no negligence on the part of Drs. Kappes or Glicklich are not supported by credible evidence. We reject this contention.

The standard of review for a sufficiency-of-the-evidence challenge to a jury verdict is well settled. We look for any credible evidence which under any rational view fairly admits of an inference which will support the jury's findings. *See Johnson v. Misericordia Community Hospital,* 97 Wis. 2d 521, 561, 294 N.W.2d 501, 521 (Ct. App. 1980), *aff'd,* 99 Wis. 2d 708, 301 N.W.2d 156 (1981).

The record contains evidence supporting the finding that Children's Hospital was causally negligent. The unanimous panel findings on liability were that Children's Hospital was negligent, and these liability findings were properly received into evidence. *See* sec. 655.19(1), Stats.

The jury also heard ample testimony by hospital personnel and expert witnesses to the effect that Regena had been exhibiting classic symptoms of shock from internal bleeding for an extended period of time without adequate response. Dr. Jordan Weitzman, an expert witness for the Fund, testified that the quality of care given by the nurses on the night in question was "dreadful." Dr. Weitzman said that the Children's Hospital nursing staff should have realized by about midnight that something was wrong with Regena and that by 1:00 a.m. Regena was exhibiting all the classic symptoms of shock. Dr. Weitzman also testified that the first year resident, Kojima, had deviated from the standard of reasonable care.

The record shows that Kojima came into Regena's room at approximately 2:00 a.m. Between approximately 2:10 a.m. and 2:45 a.m. he made six to twelve attempts to get an I.V. into Regena to give her blood but was unable to do so. No effort was made, either by Kojima or the nurses, to get other doctors in the hospital who were capable of performing the procedures to give Regena blood. No call was made for help over the intercom when it became apparent that Kojima was not going to be able to give the transfusion. Regena did not receive the two pints of blood which had been typed and cross-matched for her until after 3:00 a.m., over an hour after Kojima first entered her room.

It is true that there was also testimony exonerating Kojima and blaming Drs. Glicklich and Kappes for ap-

proving the leaving of a first year resident with only eight days experience on call at the hospital. However, it was well within the jury's province to reject that testimony and to believe, instead, testimony by several physicians that Drs. Kappes and Glicklich acted reasonably and in accordance with accepted medical practice in placing a first year resident on call.

Viewing the testimony in the light most favorable to the jury's findings, we conclude that credible evidence supports the findings that Children's Hospital, acting through its employees, was negligent in the care and treatment of Regena, that such negligence was a cause of her injuries, and that Drs. Glicklich and Kappes were not negligent in their care and treatment of Regena. Accordingly, we uphold those findings.

The Fund's second argument is that a new trial on all issues is required because of perversity or excessiveness in the jury's verdict and because of alleged errors committed by the court during the trial. We do not agree that a new trial on all issues is mandated, but we offer the option of a new trial on the issue of damages if Regena does not accept our reduction of the award for past and future pain, suffering and disability. We also reduce to zero the award to the Hermans for their loss for services which must be rendered to Regena as a result of her injury; we hold that there was a failure of proof as to the value of those services. On all other items of damages and on the alleged errors committed at trial, we affirm.

## DAMAGES

We agree with the Fund that the award to Regena of $2,609,000 for past and future pain, suffering and disability was excessive. An award is excessive where it reflects a rate of compensation beyond reason. *See*

*Roach v. Keane,* 73 Wis. 2d 524, 539, 243 N.W.2d 508, 517 (1976). Excessiveness, alone, is not sufficient to label a verdict perverse. *Redepenning v. Dore,* 56 Wis. 2d 129, 134, 201 N.W.2d 580, 583 (1972). Therefore, a new trial on all issues is not warranted.

■

Where the trial court has reviewed the evidence and approved the damage award, this court is reluctant to interfere. *Roach,* 73 Wis. 2d at 539, 243 N.W.2d at 516. However, where the trial court's analysis of the evidence supporting the award is inadequate, we may properly engage in an independent review of the evidence to determine whether it supports the award. *See id.*

■

We determine that the $2.6 million award was excessive partly on the basis that the award was greatly in excess of the amount requested in closing argument by Regena's counsel. Her counsel asked the jury to award between $625,000 and $925,000 for Regena's pain, suffering and disability. The jury awarded $2,609,000, or three times as much as the highest figure suggested by counsel. In *Van Gheem v. Chicago & North Western Railway,* 33 Wis. 2d 231, 238–40, 147 N.W.2d 237, 241 (1967), our supreme court upheld a trial court's determination of excessiveness where the jury made an award more than three times higher than the amount suggested by counsel for the plaintiff. We also take into consideration, although it was not before the jury, the fact that the compensation panel award for pain, suffering and disability was $260,000.

Our primary rationale for reversing this award, however, is that it is not supported by the evidence. The trial court, on motions after verdict, set forth for the record an analysis of the jury's award for pain, suffering and disability. In the trial court's estimation the award was sustainable because Regena was aware that she was a changed person after the injury:

Pain—past and future pain, suffering and disability, $2,609,000. That's an awful lot of money. I think at ·this point it would be well that I set forth for the record the Court's observations of Regena. I think it would be helpful because it may help somebody later on understanding what perhaps the jurors perceived because in this case the Court and the jurors are pretty much in the same boat. None of us had ever seen Regena before . . . . And I'm going to use terms in a non-technical sense; but, if I were required to describe Regena, I would call her border-line retarded. Now that's my term. I realize that's inconsistent with the terms that the experts in the field used, but I say retarded because she was noticeably different. I say border-line because she certainly had some ability to function. She did on the witness stand, and all the testimony supported that. Now, I think something happened during the course of trial, and I—we had some witnesses on the witness stand that . . . if believed, would indicate that whatever damage there was to Regena in terms of her mental capacity was of rather minimal effect. Now, if that kind of testimony is given credibility, it serves to minimize the damages. . . . I think that . . . when you get witnesses on the witness stand who minimize, and in the eyes of the trier of fact their testimony is incredible, . . . instead of minimizing the damages, it serves to maximize the damages. And if somebody wants this Court's opinion as to why the jury came in with high numbers instead of low numbers, and I don't think there's any question the numbers are high, I said that before, I think that's a primary reason. . . .

Now, in my own thinking, in my own evaluation, I was sort of thinking, well, the greater the brain damage, the greater the pain, suffering and disability. I've had the opportunity to rethink that concept and I'm not too sure that's true. . . . If we have the kind of brain damage where a person has no knowledge any more of what's going on, the pain, suffering and disability may in fact be less than in the situation that we had testimony to in the case of Regena, because the testimony indicated that not only was Regena different, but she was aware that she was different. And it's that awareness that becomes the pain and suffering.

The record reveals that Regena testified that the children in her seventh grade class called her "palsy" and threw things in her hair. She testified that she had only one friend and that, at recess, she was not invited into games and that other children did not play with her.

We have no comment on whether there is, indeed, greater pain and suffering where there is a lesser degree of intellectual impairment as opposed to a greater degree. The pertinent point to be made is that the award is one for pain, suffering *and disability*. Regena's emotional pain stemming from her poor self-concept, while undeniably worthy of generous compensation, must be considered in light of the fact that she walks, talks, reads, dresses herself, can ride a bicycle, will graduate from high school, and will be able to work in an entry level position. In light of evidence of this nature, we deem a $2.6 million award excessive.

In summary, because the award was extremely large, indeed three times as large as the largest amount which Regena's counsel suggested would be fair and reasonable, and because it was not in line with the evidence, we conclude that the award was excessive. Nevertheless, nothing in the record leads us to believe that the award, or the verdict as a whole, was perverse.

Under the *Powers* rule[1] we have the authority to reduce an excessive award and grant the plaintiff the option of accepting that sum or having a new trial on the issue of damages. *See Roach,* 73 Wis. 2d at 539–40, 243 N.W.2d at 517. We determine that a reasonable and fair award for Regena's past and future pain, suffering and disability would be $925,000, the highest amount requested by her counsel.

[1] *Powers v. Allstate Ins. Co.,* 10 Wis. 2d 78, 102 N.W.2d 393 (1960).

The Fund argues that the award to Regena of $281,917 for loss of earning capacity during her majority reflects perversity in the verdict. The Fund quarrels with the fact that the figure awarded by the jury was not testified to by any witness. Dr. Karl Egge, an economist retained by the plaintiffs, testified to the effect that Regena's loss of earnings would be $302,355, assuming she would have graduated from college had she not been injured, or $192,807, assuming she would have only graduated from high school. The Fund reasons that since no defendant introduced testimony contradicting that of Dr. Egge, the award for loss of earning capacity was capable of exact computation and the jury's award of a different figure was inconsistent with the evidence. We reject this contention summarily. The award was not clearly contrary to the evidence and was within the range of figures suggested by the evidence. The *Nelson* case cited by the Fund suggests only that the susceptibility of evidence to an exact computation of damages becomes a factor for a reviewing court to consider where the damages awarded are grossly inadequate or excessive. *See Nelson v. Fisher Well Drilling Co.*, 64 Wis. 2d 201, 211, 218 N.W.2d 489, 492–93 (1974). The Fund cites no case which holds that a jury must award, dollar for dollar, a figure suggested by an uncontradicted expert. We affirm the award to Regena for loss of earning capacity.

We also affirm the award to Regena's parents of $350,000 for their past and future loss of their daughter's society and companionship and earning capacity during minority. The Fund argues that "[w]hile there can be no doubt that the parents did sustain some loss as a result of the injury to the child, there was no specific testimony as to that point."

The jury heard testimony that Regena was permanently physically and mentally disabled; the record is replete

with examples of Regena's inability to do things which her parents reasonably should have expected of her. The jury was told that Regena's personality had become flat and her expression reduced in emotional quality. The jury heard that the Hermans' marriage was a second and successful one for them and that Regena, their only child, was the center of their lives.

The court gave the standard instruction on parents' damages for loss of society and companionship from injury to a minor child, Wis JI—Civil 1837. The instruction illustrates the intangible nature of the loss of aid, comfort, society and companionship. It states that in evaluating the impairment of the parents' and child's relationship, the jury should consider the age of the parents and of the minor child; the love and affection and conduct of each toward the other; the society and companionship that was provided to the parents by the child; the personality, disposition, and character of the child; and the disposition and susceptibility of the parents to suffer from such loss.

The direct evidence which the jury heard and the reasonable inferences which could be drawn therefrom shed light on all of the above factors. The value which the jury placed on the Hermans' loss, though high, was not excessive. We uphold the award.

The Fund argues that the court did not inform the jury that an award for loss of society and companionship is limited to the child's minority. Our review of the transcript discloses that the court did so inform the jury:

> If you find that Regena Herman's disability will continue in the future as a natural result of the injuries and that Gene and Nancy Herman will suffer an impairment or diminution of the society and companionship of Regena Herman in the future, you will consider in your sum, such sum as will reasonably compensate Gene and Nancy Herman until Regena Herman reaches her 18th birthday.

The final disputed item of damages is the award of $30,000 to the Hermans for their past and future services rendered to Regena during her minority as a result of her injury. The Fund concedes that ample testimony was presented as to the services rendered, e.g., nursing care for one month after Regena came home from the hospital, past and future supervision of Regena, Mr. Herman's playing of a video game with Regena to improve her hand/eye coordination. However, the Fund argues, and we agree, that no testimony whatsoever was presented as to the value of these services.

Wis J I—Civil 1845 instructs that the amount to be allowed for the parents' services to the child shall not exceed an amount they would have been compelled to pay others to render such or similar services. Since no testimony was presented bearing on what it might have cost the Hermans to pay others to serve and care for Regena, there was no basis for the jury to determine whether its award exceeded the amount it would have cost to pay others to render these services. Damages need not be proved with mathematical certainty, but the claimant must establish sufficient data from which the jury can properly estimate the amount. *Plywood Oshkosh, Inc. v. Van's Realty & Construction,* 80 Wis. 2d 26, 31, 257 N.W.2d 847, 849 (1977). Because the Hermans did not establish sufficient data from which the jury could estimate their loss for services rendered to Regena, there was a complete failure of proof such that the award could only have been based on speculation. *See Misericordia Hospital,* 97 Wis. 2d at 566, 294 N.W.2d at 523. Therefore, the award must be overturned.

## ALLEGED ERRORS AT TRIAL

The Fund argues that the trial court abused its discretion in not advising the jury of all findings of dam-

ages by the patients compensation panel. The court read only the liability findings and the finding of $17,500 for medical expenses.

Section 655.19(1), Stats., provides that the panel's findings as to damages may be read to the jury in the trial court's discretion. The Fund contends the statute does not permit the court to read one item of damages— namely, the award for medical expenses—and not the rest. The Fund cites no authority supporting this position. In any event, the issue is waived as the Fund made no timely objection. The Hermans' counsel submitted a proposed instruction regarding the findings of the panel well in advance of trial. Counsel for the Fund raised no objection to the instruction. We are not obliged to review a waived claim of error. *See County of Columbia v. Bylewski,* 94 Wis. 2d 153, 171, 288 N.W.2d 129, 138–39 (1980).

The Fund argues the trial court erred in striking a portion of the testimony of John Melvin, M.D., a witness retained by Children's Hospital. Dr. Melvin, medical director for Curative Rehabilitation Center, testified, over objection, concerning Regena's vocational prospects and reduction in future earning capacity. After voir dire, the trial court determined that Dr. Melvin had no expertise in economics and struck the testimony.

The admission of expert testimony is largely a matter within the trial court's discretion. *Valiga v. National Food Co.,* 58 Wis. 2d 232, 251–52, 206 N.W.2d 377, 388 (1973). An expert witness may only testify within the areas in which he or she is qualified. *Roberts v. State,* 41 Wis. 2d 537, 551, 164 N.W.2d 525, 531–32 (1969), *overruled on other grounds,* 74 Wis. 2d 503, 247 N.W.2d 116 (1976). A qualified physician may give percentage-of-disability testimony from which the jury may determine impairment of earning capacity. *Bituminous Casualty Co. v. DILHR,* 97 Wis. 2d 730, 736, 295 N.W.2d 183, 187 (Ct. App 1980).

Because Dr. Melvin practiced in the field of vocational rehabilitation and, as part of that practice, made diagnoses to determine restrictions on patients' vocational activity, we hold that he was qualified to give his opinion as to Regena's lost earning capacity. Thus, the trial court abused its discretion in striking the testimony. Nevertheless, we do not deem the error to be one affecting the substantial rights of the adverse party, *see* sec. 805.18, Stats. The testimony went only to damages, not liability; the erroneous exclusion of the testimony does not warrant ordering a new trial on all issues. We hold that the error was harmless.

The Fund charges error in the trial court's limitation on the cross-examination of economist Dr. Karl Egge so as to exclude testimony concerning the fixed cost of an annuity. The Fund contends the testimony would have been relevant to show that a much lower award than that requested, if invested in an annuity, would give the equivalent of the economist's projected figures for loss of earning capacity.

Using the cost of an annuity contract to measure the present value of future losses has never been approved in Wisconsin. A federal court has rejected the use of annuity cost evidence for that purpose: "The cost of an annuity for the remainder of the injured person's life is not the measure of recovery for lost or diminished earning power. The measure is, as we have stated, the gross amount of the lost earnings reduced to their present cash value." *Farmers Union Federated Cooperative Shipping Assoc. v. McChesney,* 251 F2d 441, 444 (8th Cir. 1958). There is a difference between using a mathematical annuity table to determine life expectancy, *see Donlea v. Carpenter,* 21 Wis. 2d 390, 400, 124 N.W.2d 305, 311–12 (1963), and using a table showing the cost of annuity contracts paying var-

ious amounts for various life expectancies to establish the present value of future losses. *See Annot.,* 8 Am. Jur. POF 2d § 5 (1976).

Wis J I—Civil 1796 instructs that future losses must be reduced to present value; Wis J I—Civil 1797 permits consideration of inflation. Once a jury has discounted a future loss to present value, taking inflation into account, its task has been accomplished. The jury is not instructed to take into account how much can then be earned with the discounted sum. Admission of annuity evidence could have misled the jury into believing it must award a lesser sum than the present value of the future losses. Therefore, the trial court did not abuse its discretion in limiting the cross-examination of Dr. Egge so as to exclude testimony on the cost of an annuity.

The Fund raises the issue that the trial court improperly instructed the jury on the hospital's duty of care; its argument, however, is so sketchy and inadequate that we refuse to address it. *See State v. Beno,* 99 Wis. 2d 77, 91, 298 N.W.2d 405, 413 (Ct. App. 1980).

The Fund contends that Regena's counsel's argument that $25,000 would be reasonable compensation for Regena's first year of pain and suffering was a per diem argument, prohibited by *Affett v. Milwaukee & Suburban Transport Corp.,* 11 Wis. 2d 604, 106 N.W.2d 274 (1960). *Affett* prohibits suggesting a per diem formula for future losses because it represents pure speculation about future variables. *Affett* does not prohibit a plaintiff's counsel from naming a dollar amount for either past or future pain and suffering which he or she believes the evidence would fairly and reasonably sustain. *See id.* at 614, 106 N.W.2d at 280. The trial court did not err in not granting a new trial on the basis of this asserted error.

The Fund argues that it was wrongly precluded from commenting in its closing argument that Drs. Kappes and Glicklich were staff of Children's Hospital and that the panel had found Children's Hospital negligent through its staff. The record shows that the jury was instructed that the hospital was negligent through its employees and staff and that no finding was made regarding the acts of Drs. Kappes and Glicklich.

The content of the arguments by counsel to the jury is a matter resting in the trial court's discretion. *Fields v. Creek,* 21 Wis. 2d 562, 572, 124 N.W.2d 599, 604 (1963). It appears the Fund's argument was designed to persuade the jury that if Children's Hospital was negligent through its staff, as the panel had found it was, then, as "staff" of Children's Hospital, Drs. Kappes and Glicklich necessarily were negligent as well. The trial court did not abuse its discretion in barring argument by counsel which might have confused or misled the jury.

The Fund claims the trial court erred in failing to advise the jury of a "stipulation" by the plaintiffs to the "capabilities" of Dr. Kojima. During the course of deposing Dr. Kojima in December, 1980, counsel for the plaintiffs prefaced a question with the statement, "Dr., I will stipulate on the record that you did 100% of your capabilities and that you were bright, intelligent and were understanding of what you were doing." At trial, counsel for the Fund proposed that the statement be read to the jury as an admission or stipulation. The trial court refused to allow the statement to be read or to instruct the jury on it, reasoning that it appeared that the stipulation, "if indeed it [was] a stipulation," had been for the purposes of the questioning only and for no broader purpose. The court added that, under the circumstances, it did not view the statement as even

being a "stipulation," despite the use of the word. We hold that the trial court exercised sound discretion in refusing to instruct the jury that the plaintiffs had stipulated to Dr. Kojima's capability.

The Fund argues that the trial court improperly limited its cross-examination of Dr. Glicklich and other hospital employees and improperly permitted the Hermans' counsel to cross-examine or call adversely certain witnesses, including Drs. Humphrey, Kappes and Glicklich. The Fund wished to cross-examine Dr. Glicklich using contradictory deposition testimony of Dr. Kappes regarding staff discussions of emergency procedures. The scope of cross-examination is within the discretion of the trial court. *Schmiedeck v. Gerard*, 42 Wis. 2d 135, 149, 166 N.W.2d 136, 143 (1969). The trial court in this case properly considered the commonality of interest between the Fund and Children's Hospital and its agents, including Dr. Glicklich, in limiting cross-examination. Dr. Glicklich was closely associated with a party not adverse to the Fund. The same is true of the other hospital employees. We cannot say that an abuse of discretion occurred in restricting the Fund's cross-examination of these witnesses.

As for permitting the Hermans' counsel to cross-examine Drs. Humphrey, Kappes and Glicklich, the trial court again considered the close association between the physicians and Children's Hospital and decided to treat the physicians as adverse to the plaintiffs for purposes of cross-examination. We see no abuse of discretion.

The Fund asks for a new trial in the interest of justice. It argues that even if there is sufficient evidence to sustain the verdict, the verdict is against the great weight and clear preponderance of the evidence. *See Krolikowski v. Chicago & Northwestern Transportation*

*Co.,* 89 Wis. 2d 573, 580, 278 N.W.2d 865, 867–68 (1979). The Fund argues further that it was prejudiced by media coverage of the trial.

We have already reviewed the evidence and determined its sufficiency to support the verdict. Our review has also convinced us that the verdicts on the negligence and the approved damage issues were supported by the great weight and clear preponderance of the evidence. As for the media coverage, the jury was instructed not to read any newspaper articles or listen to any broadcasts concerning the case. We hold that a new trial in the interest of justice is not warranted.

In summary, we have reviewed all alleged trial errors and disputed items of damages. We have affirmed the trial court on all but two damage awards. We hold that a new trial on all issues is not required.

## COSTS AND INTEREST

The Fund charges error in the trial court's refusal to incorporate into the judgment the statutory limitation on the Fund's payments on the judgment. Section 655.27 (5) (d), Stats., states, "In the event the fund incurs liability exceeding $1,000,000 to any person under a single claim the fund shall pay not more than $500,000 per year until the claim has been paid in full, and any attorney's fees in connection with such claim shall be similarly prorated." We agree with the Fund that the statute is clear, and we modify the judgment to reflect the statutory limitation. We hold that the claims which underlie this action are a "single claim" for purposes of sec. 655.27(5)(d). *See Korth v. American Family Insurance Co.,* 115 Wis. 2d 326, 340 N.W.2d 494 (1983).

The final issue on this appeal is whether the Fund is solely liable for costs and interest on the judgment. The

trial court granted Children's Hospital's motion to amend the judgment, pursuant to sec. 655.23, Stats., to limit the hospital's liability to $200,000, inclusive of costs and interest. The trial court further ruled that in this case the amounts to which Regena and the Hermans were entitled which represented costs and interest were properly assessed against Children's Hospital's excess carrier, the Fund, in accordance with sec. 655.27, Stats. Section 655.27 provides that the Fund pays that portion of a claim which is in excess of the limit on a health care provider's liability, as expressed in sec. 655.23(5). Regena and the Hermans cross-appeal from the portion of the judgment limiting Children's Hospital's liability. They argue that should the Fund prevail on its argument that it has no liability for statutory costs and interest, they will be unable to recover the costs and interest from any party.

The Fund points out that sec. 655.27, Stats., makes no provision for assessing costs or interest. The Fund argues that since it has no liability other than that created by statute, it cannot be liable for any costs or interest. Therefore, argues the Fund, that responsibility must fall upon Children's Hospital and its insurer. We disagree. As we read the relevant statutes, provision is made for costs and interest to be assessed in trials following panel hearings. No provision is made, however, for a health care provider, (e.g., Children's Hospital) in compliance with Chapter 655, to incur liability exceeding that provided for in sec. 655.23(5), Stats.

Section 655.17(8), Stats., provides in part that "[i]n all hearings before a formal panel under this section, costs shall be awarded as provided for civil actions." The Fund would have us conclude that costs can be taxed after a panel procedure but not after a circuit court trial de novo. Not only does such reasoning run counter to logic and common sense, but it ignores sec. 655.27(5)(a), Stats., which provides in relevant part that in a trial

de novo for damages likely to exceed $200,000 "the fund may retain counsel and pay out of the fund attorney's fees and expenses including court costs incurred in defending the fund." Additionally, sec. 655.19, Stats., which permits any party to obtain a trial de novo in circuit court, states that "[i]n the case of a trial subsequent to a formal panel hearing, the court may award actual court costs and reasonable attorney fees in excess of statutory limitations to the prevailing party."

The Wisconsin Rules of Civil Procedure are applicable to circuit court civil actions. We are aware of no authority under which they may be disregarded simply because the circuit court action was preceded by a Chapter 655 action. Since costs and interest may be assessed in trials following panel hearings, and since the Fund is responsible for liability incurred by a health care provider in excess of the statutory limits, it follows that the Fund is responsible for costs and interest awarded to a party whose claim against a health care provider resulted in a judgment in excess of the statutory limits on the health care provider's liability. Further, in this case, not to apply to the Fund the punitive provisions of sec. 807.01 (4), Stats., would be to condone its unreasonable failure to settle and to invite unnecessary litigation in the future. We conclude that the trial court correctly assessed costs and interest against the Fund, and we therefore affirm.

In their cross-appeal the Hermans and Regena raise a constitutional challenge to sec. 655.27(5)(d), Stats., as it applies to them. They claim a denial of equal protection in that the interest alone[2] on their unmodified award would amount to $500,000 per year and that the Fund would thus never begin to make payments on the corpus of the award. There is a dispute as to whether this issue

---

[2] The interest on the judgment is twelve percent pursuant to sec. 807.01(4), Stats.

was waived for failure to raise it at the trial level. In any case, this court has reversed two items of damages, and the calculations which form the basis for the Hermans' constitutional challenge no longer apply. Therefore, we will not address the argument.

In summary, we reverse the award to Regena for past and future pain, suffering and disability and reduce it to $925,000, with the option of a new trial on the issue of damages; we reverse the award to the Hermans for services rendered to Regena on account of her injury; we modify the judgment to reflect the statutory limitation on the amount the Fund must pay on the judgment per year; and in all other respects we affirm the judgment.

*By the Court.*—Judgment affirmed in part; reversed in part; modified in part.